91 P.3d 312

**Janette Rae Smith RIEPE,
Petitioner–Appellant,**

v.

**Brandy Jo RIEPE, Respondent–Appellee.**

No. 1 CA–CV 03–0184.

Court of Appeals of Arizona,
Division 1, Department B.

May 25, 2004.

As Amended June 29, 2004.

Hufford, Horstman, Mongini, Parnell & McCarthy, P.C., by Philip (Jay) McCarthy, Jr., Flagstaff, Attorneys for Petitioner–Appellant.

Consuelo A. Brennan, Flagstaff, Attorney for Respondent–Appellee.

## OPINION

TIMMER, Judge.

¶ 1 Can the superior court award in loco parentis visitation to a widowed step-mother pursuant to Arizona Revised Statutes ("A.R.S.") section 25–415(C) (2000) when the

stepchild enjoyed good relationships with both legal parents before the father's death and the child is currently parented by his legal mother?  We address this issue in Janette Rae Smith Riepe's ("Stepmother") appeal from the denial of her petition for visitation with her eight-year-old stepson, Cody, filed pursuant to § 25–415(C).  For the reasons that follow, we hold that § 25–415(C) authorizes the court to award reasonable visitation under such circumstances if the factors set forth in that provision are otherwise satisfied.  Because the court misinterpreted § 25–415 by requiring Stepmother to prove that Cody's relationship with her was equal to or superior to the relationship he shared with his legal parents, we reverse and remand with instructions for the court to assess the evidence presented in support of and in opposition to the petition using the correct interpretation of § 25–415.

## BACKGROUND

¶ 2 Cody's legal parents,[1] Brandy Jo Riepe ("Mother") and David Allen Riepe ("Father"), were divorced in 2000.  The parents shared joint custody, and Father was the primary residential parent.  Mother had parenting time every other weekend, one evening a week, and extended time over school vacations.  Father began dating Stepmother in May 1999.  Father and Cody moved in with Stepmother and her three sons in January 2000.  Father and Stepmother married in May 2001.  Tragically, Father died in a traffic accident in November 2001.

¶ 3 Prior to and during her marriage with Father, Stepmother spent a significant amount of time with Cody. One of Stepmother's sons and Cody attended the same school, and she transported them to and from school. She fed Cody, was involved in his classroom, and cared for him both before and after she married Father.  All evidence shows that Stepmother was a very loving and involved person in Cody's life during the time she was with Father.  During this time, Mother also was involved with Cody and paid child support to Father.

---

1.  A "legal parent" is "a biological or adoptive parent whose parental rights have not been ter- minated."  A.R.S. § 25–415(G)(2).

¶ 4 After Father died, Cody began living with Mother. Mother did not allow contact between Stepmother and Cody, and Stepmother therefore filed a petition for in loco parentis visitation pursuant to A.R.S. § 25–415(C). After holding an evidentiary hearing on Stepmother's petition and reviewing memoranda from both parties, the superior court found that Stepmother had failed to carry her burden of proving that she stood in loco parentis to the child. Specifically, the court found as follows:

> [Stepmother] has shown that she was a caring and supportive step-parent and that Cody did bond to her. However, throughout Cody's and [Stepmother's] relationship, and while Cody's father was alive, Cody's natural mother and father fulfilled the rights and responsibilities of, parents while [Stepmother] played a supportive role to her husband['s] role of father to Cody. Although Cody may have referred to [Stepmother] as "mom", Cody seems to embrace those who show him love and support and brings them into his "family" using terms of familial relationship, such as aunt and uncle, despite the lack of a blood relationship. While he may use the term "mom" to show affection and to give value to his relationship with [Stepmother], the Court is not persuaded that this is indicia that he views [Stepmother] as mother in the same sense that he views his natural mother.

> [Stepmother] cared for and supported Cody. However, based upon the evidence presented, the Court cannot factually conclude that she stood in loco parentis to Cody as defined by A.R.S. § 25–415(G)(1).

The court therefore denied the petition and this appeal followed.

## STANDARD OF REVIEW

■ ¶ 5 We review de novo the superior court's interpretation and application of

A.R.S. § 25–415. *Thomas v. Thomas,* 203 Ariz. 34, 36, ¶ 7, 49 P.3d 306, 308 (App.2002). We are not bound by the court's conclusions of law "that combine both fact and law when there is an error as to the law." *Lee Dev. Co. v. Papp,* 166 Ariz. 471, 476, 803 P.2d 464, 469 (App.1990).

## DISCUSSION

■ ¶ 6 Stepmother first argues that the superior court incorrectly interpreted A.R.S. § 25–415 to require her to prove that her relationship with Cody was the same as or superior to his relationship with Mother. Section 25–415(C) authorizes the court to grant reasonable visitation rights to "a person who stands in loco parentis to a child" upon a finding, among others, that visitation is in the child's best interests.[2] Section 25–415(G)(1) defines one "in loco parentis" as "a person who has been treated as a parent by the child and who has formed a meaningful parental relationship with the child for a substantial period of time."

¶ 7 Stepmother contends that the court imposed an additional burden not prescribed by § 25–415 by requiring her to persuade the court that Cody viewed Stepmother "as mother in the same sense as he views his natural mother." According to Stepmother, this burden effectively requires an individual seeking in loco parentis visitation to prove that the child's relationship with that individual is equivalent to or superior to his or her relationship with the parent(s) rather than simply proving that the child treated the individual "as a parent" and that they enjoyed "a meaningful parental relationship" for a substantial period of time, as set forth in § 25–415(G)(1).

¶ 8 Mother counters that the court correctly interpreted § 25–415(G)(1) to require Stepmother to show that her relationship with Cody was the same as or superior to his

---

**2.** Section 25–415(C) provides in full as follows:
The superior court may grant a person who stands in loco parentis to a child, including grandparents and great-grandparents, who meet the requirements of § 25–409 reasonable visitation rights to the child on a finding that the visitation is in the child's best interests and that any of the following is true:

1. One of the legal parents is deceased or has been missing at least three months.
2. The child's legal parents are not married to each other at the time the petition is filed.
3. There is a pending proceeding for dissolution of marriage or for legal separation of the legal parents at the time the petition is filed.

relationship with Mother and Father. Relying on dictionary definitions of "in loco parentis," she asserts that § 25–415(G)(1) required Stepmother to show that she stood "in the place of" a natural parent in order to receive visitation rights. Because Mother and Father fulfilled the rights and obligations of parents to Cody before Father's death, Mother contends that Stepmother could not have "stood in the place" of either parent.

¶ 9 We disagree with Mother's position. This court looks to commonly used definitions of statutory terms only when the legislature has not ascribed a particular meaning to such terms. *State v. Wise*, 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983) (acknowledging that unless legislature clearly expresses intent to give term a special meaning, court gives words used in statutes their plain and ordinary meaning, which can be gleaned from dictionaries). Here, because the legislature has provided a definition of in loco parentis in § 25–415(G)(1), we must look no further than that definition when deciding what is required to establish in loco parentis status.

¶ 10 Section 25–415(G)(1) does not require a person seeking in loco parentis visitation to establish that he or she has a parental relationship with a child that replaces that child's relationship with a legal parent. Similarly, the petitioning party need not show that his or her relationship with the child is superior to the child's relationship with one or both legal parents. Rather, to establish in loco parentis status, a non-parent must prove that the child (1) treated that person as a parent and (2) formed a meaningful parental relationship with that person for a substantial period of time. A.R.S. § 25–415(G)(1). Assuming that the remaining factors set forth in § 25–415(C) are satisfied, including a finding that visitation is in the child's best interests, the court can order reasonable visitation. Thus, as Mother acknowledged in oral argument before this court, the superior court can grant in loco parentis visitation to a petitioning party even if the child maintains a meaningful parental relationship with his or her legal parents. With these principles in mind, we turn to the superior court's application of § 25–415(G)(1) in its ruling.

¶ 11 The superior court found that Stepmother failed to prove both that Cody had treated her as a parent and that she had formed a meaningful parental relationship with Cody for a substantial period of time. In explaining this finding, the court stated that before Father's death, he and Mother fulfilled the rights and responsibilities of parents while Stepmother had played a supportive role to Father. The court further concluded that although Cody called Stepmother "mom," this reference did not indicate that he viewed Stepmother "as mother in the same sense that he views his natural mother."

¶ 12 Although somewhat unclear, it appears the court adopted Mother's position that Stepmother was required to prove that she stood in the place of either Father or Mother and could not establish in loco parentis status if Cody had enjoyed parental relationships with his legal parents. Because § 25–415(G)(1) does not require such a showing, we reverse the judgment and remand to the superior court for further proceedings. Specifically, in deciding whether Stepmother stands in loco parentis with Cody, the court should consider only whether Cody views Stepmother as a parent, and whether they have formed a meaningful parental relationship, which has endured for a substantial period of time. If the court then decides that Stepmother does not stand in loco parentis with Cody, it must deny the petition. If the court decides that Stepmother has achieved this status, the court must then consider whether Stepmother should have reasonable visitation rights after applying the factors set forth in A.R.S. § 25–415(C), including whether visitation would be in Cody's best interests.

¶ 13 In light of our conclusion that the court incorrectly interpreted and applied § 25–415(G)(1), we need not decide whether the court properly assessed the evidence using the incorrect definition of in loco parentis.

## Response to the Dissent

¶ 14 Our dissenting colleague asserts that we "unhinge the ties of gender and number contained within Arizona's definition of the term 'parent,'" ¶ 127, *infra,* in an attempt to "judicially accommodate[ ]" step-relationships, ¶ 152, *infra.* He further contends that we promote same-sex parenting and polyamory, ¶¶ 97–104, *infra,* impinge marriage, ¶¶ 99–106, *infra,* circumvent the democratic process, ¶¶ 112–15, *infra,* and violate the constitutional rights of legal parents to parent their children, ¶¶ 116–19, *infra.* With due respect to our colleague, today's decision is not born of our invention but instead stems from the language and purpose of A.R.S. § 25–415. The Dissent's concerns about the social ramifications of this provision are more appropriately raised to the legislature. However, we are compelled to apply well-established principles of statutory construction to reveal the fallacy of the Dissent's interpretation of § 25–415.

¶ 15 The Dissent's arguments are based on the erroneous notion that our interpretation of A.R.S. § 25–415 creates additional parents for a child, which are unlimited in number and gender combinations. *See, e.g.,* ¶ 60, *infra.* According to the Dissent, because a child can only have one mother and one father, a third party cannot obtain in loco parentis status unless that person serves as a same-gender substitute for one of the child's parents. *See, e.g.,* ¶ 73, *infra.* The Dissent mistakenly blurs the concepts of "parent" and "in loco parentis" and imposes limitations on in loco parentis visitation that are not supported by § 25–415.

¶ 16 First, the Dissent contravenes established principles of statutory interpretation by construing the term "parent" without considering the context of its usage in § 25–415. *See* ¶¶ 41–59, *infra.; Mary Lou C. v. Arizona Dept. of Economic Sec.,* 207 Ariz. 43, 47, ¶ 9, 83 P.3d 43, 47 (App.2004) ("We ... interpret a statute's individual provisions in the context of the entire statute."). The legislature did not authorize in loco parentis visitation for a "parent," but instead bestowed authority on the court to grant such visitation to "a person" standing in loco parentis to a child. A.R.S. § 25–415(C). Section 25–415(G)(1) defines "in loco parentis" as a person (1) who a child *treats as a parent,* and (2) who has established a *meaningful parental relationship* with the child for a substantial period of time. The Dissent mistakenly assumes that "treated as a parent" and "parental relationship" are synonymous with "parent." But by choosing to authorize visitation for persons "treated as a parent," the legislature plainly intended § 25–415(C) to apply to *non-parent* visitation. The opposite conclusion would make the words "treated as" entirely superfluous. *See Herman v. City of Tucson,* 197 Ariz. 430, 434, ¶ 14, 4 P.3d 973, 977 (App.1999) (citation omitted) (noting courts avoid interpreting statute "so as to render any of its language mere 'surplusage,' [and instead] give meaning to 'each word, phrase, clause, and sentence ... so that no part of the statute will be void, inert, redundant, or trivial.'"). In sum, a person standing in loco parentis to a child for purposes of § 25–415(C) is not a "parent," and the meaning of "parent" in other contexts, therefore, is inconsequential.

■ ¶ 17 Our conclusion is underscored by the fact that the legislature authorized in loco parentis visitation even when the child has two legal parents, each with attendant parental rights. *See* A.R.S. § 25–415(C)(2), (3) (authorizing visitation when in child's best interests and legal parents are either not married to each other or are in process of dissolving marriage); § 25–415(G)(2) (recognizing that legal parents have "parental rights"). Additionally, the legislature's inclusion of grandparents and great-grandparents in the category of persons who can obtain in loco parentis visitation privileges indicates that § 25–415(C) applies to non-parent visitation. Such visitation is not dependent on a finding that the child does not or did not enjoy a meaningful and healthy relationship with one or both legal parents, as suggested by the Dissent. *See* ¶ 136, *infra.* By contrast, in order to obtain in loco parentis *custody,* a petitioning party must establish, among other things, that it would be "significantly detrimental to the child to remain or be placed in the custody of either of the child's living legal parents who wish to retain or obtain custody." A.R.S. § 25–415(A)(2).

¶ 18 In short, by crafting its definition of "in loco parentis," the legislature did not require a showing that the child *substituted* the petitioning party for a legal parent. A person standing in loco parentis to a child is not a "parent," does not enjoy parental rights,[3] and therefore does not become an "additional parent," as the Dissent suggests. *See* ¶ 60, *infra*. Therefore, whether or not Stepmother stands in loco parentis to Cody for the purpose of obtaining reasonable visitation privileges, Mother will remain Cody's sole parent with attendant rights and responsibilities.

¶ 19 Second, the Dissent's view that a petitioning party cannot be in loco parentis if the child has a parent of the same gender as the petitioning party is unsupported by the plain language of § 25-415. *See Williams*, 175 Ariz. at 100, 854 P.2d at 133 (noting statute's language is best and most reliable guide of its meaning). Neither the definition of "in loco parentis" nor the criteria for obtaining visitation rights requires that the petitioning party be of a different gender than a legal parent. A.R.S. § 25-415(C), (G). Additionally, if we adopted the Dissent's position, a party could never obtain in loco parentis visitation when both legal parents are living; a result that would contravene the plain language of § 25-415(C)(2), (3). *See* ¶ 17, *supra*.

¶ 20 The legislative history of § 25-415 further supports a conclusion that in loco parentis status is not tied to the number of involved legal parents or gender. As the Dissent explains, ¶¶ 79, 85, *infra*, the legislature enacted § 25-415 in 1997 in response to the supreme court's decision in *Finck v. O'Toole*, 179 Ariz. 404, 880 P.2d 624 (1994), which held that the superior court was not authorized to grant visitation rights to step-grandparents who stood in loco parentis to a child. In *Finck*, the court noted that the legislature had only provided procedures for awarding visitation to noncustodial parents, grandparents, and great-grandparents. *Id.* at 407, 880 P.2d at 627. In light of the legislature's specificity in listing the classes of parties entitled to visitation, the court reasoned that the legislature did not intend to authorize visitation for unspecified third parties, including step-parents and step-grandparents. *Id.* In a special concurrence, Justice Zlaket speculated that the legislature had not consciously intended to exclude step-parents or step-grandparents from obtaining visitation with children to whom they stood in loco parentis. *Id.* at 408, 880 P.2d at 628. Consequently, he stated that the issue "cr[ied] out for legislative clarification." *Id.*

¶ 21 In response to *Finck*, rather than simply adding step-parents and step-grandparents to the classes of parties entitled to petition for visitation, the legislature enacted § 25-415(C) to broadly provide that the court may award reasonable visitation rights to persons standing in loco parentis to a child, including, presumably, step-parents and step-grandparents, subject to satisfaction of the listed requirements. By doing so, the legislature authorized the superior court to consider each unique circumstance and award in loco parentis visitation when appropriate. The legislature did not constrain the court's discretion by imposing additional limi-

---

3. The Dissent takes issue with this view, stating, without authority, that "no *legal* parent can fully exercise 'parental rights' to the child when an [in loco parentis] parent ... has physical control of the child through state compelled custody or visitation." *See* ¶ 132, *infra*. (emphasis in original). The Dissent is wrong. First, § 25-415 authorizes in loco parentis custody or visitation under appropriate circumstances when a child has one or both legal parents, who are defined as biological or adoptive parents "whose parental rights *have not been terminated*." A.R.S. § 25-415(G)(2) (emphasis added). Second, awarding in loco parentis visitation against a parent's wishes does not eliminate that parent's rights. *See Jackson v. Tangreen*, 199 Ariz. 306, 309–10, ¶¶ 6–15, 18 P.3d 100, 103–04 (App.2000) (hold-

ing grandparent visitation statute, A.R.S. § 25-409, neither substantially interferes with nor heavily burdens parental rights and therefore does not unconstitutionally infringe upon a parent's fundamental right to control child rearing). Finally, although in loco parentis custody may burden a legal parent's rights, the standard for awarding such custody is more onerous than that for obtaining visitation. A.R.S. § 25-415(A)(2) (requiring finding, among other things, that it would be "significantly detrimental to the child to remain or be placed in the custody of either of the child's living legal parents who wish to retain or obtain custody."). Whether in loco parentis custody impermissibly infringes on a legal parent's rights, or eliminates them altogether, is not at issue in this case.

tations relating to gender or the quality of the child's relationship with his legal parents, and the Dissent errs by seeking to impose such constraints.[4] *See State v. Averyt,* 179 Ariz. 123, 129, 876 P.2d 1158, 1164 (App.1994) (court cannot interpret statute to insert words of limitation that the legislature has expressly omitted).

¶ 22 Finally, the fallacy of our dissenting colleague's position is further revealed by an examination of the effects and consequences of his view of § 25–415(C). *Forino v. Ariz. Dep't of Transp.,* 191 Ariz. 77, 80, 952 P.2d 315, 318 (App.1997) ("To discern the legislature's intent, we may consider the effect and consequences of alternative construction."). If the Dissent is correct, the court could not have awarded in loco parentis visitation to the step-grandmother in *Finck* pursuant to § 25–415(C) because the child's mother had custody of him and parented him.[5] *Finck,* 179 Ariz. at 405, 880 P.2d at 625. Conversely, the step-grandfather could have obtained in loco parentis visitation because the child did not know his biological father. Similarly, in the present case, if Cody's father had established a relationship with a same-sex partner rather than marrying Stepmother, that partner, but not Stepmother, could qualify for in loco parentis status under the Dissent's view. Such results would be absurd and could not have been intended by the legislature. *State v. Medrano–Barraza,* 190 Ariz. 472, 474, 949 P.2d 561, 563 (App.1997) ("We presume the framers of the statute did not intend an absurd result and our construction must avoid such a consequence."); *see also* A.R.S. § 1–211(B) ("Statutes shall be liberally construed to effect their objects and to promote justice.").

¶ 23 In sum, the Dissent errs by both equating parents with persons who stand in loco parentis to a child, and by imposing number and gender restrictions on obtaining in loco parentis visitation that are not supported by the language or legislative history of § 25–415. Any such restrictions must be imposed, if at all, by the legislature.

## CONCLUSION

¶ 24 In order to obtain in loco parentis visitation pursuant to A.R.S. § 25–415(C), Stepmother was not required to prove that she usurped the role that either Father or Mother served in Cody's life. Because the superior court imposed this requirement on Stepmother, we reverse the judgment and remand for further proceedings.

CONCURRING: JEFFERSON L. LANKFORD, Presiding Judge.

BARKER, Judge, dissenting.

¶ 25 My view of this matter is much closer to that of the trial judge's than it is to that of my colleagues. The majority misconstrues the in loco parentis statute ("ILP statute")[6] by utilizing an alternative definition of "parent" that judicially unhinges the ties of number and gender that pertain to that term. For the reasons that follow, I respectfully dissent.

¶ 26 Because I write at some length, the following Table of Contents is provided.

4. The Dissent quotes extensively from statements made by State Representative Mark Anderson before enactment of § 25–415 to support the Dissent's position that in loco parentis visitation can only be ordered for persons who have taken the place of legal parents who were not fulfilling their role. *See* ¶¶ 79, 90, 96, *infra.* These remarks, however, concerned custody rather than visitation.

5. The Dissent apparently attempts to avoid this result by stating that the step-grandparents in *Finck* had taken the place of both parents for a period of time before they were awarded visitation. *See* ¶ 88. In fact, neither the supreme court's decision in *Finck,* nor this court's prior decision in that case, reflects that the step-grandparents had "replaced" mother or step-father in the child's life prior to the award of visitation. Rather, we only know that the child had lived with his step-father and step-grandparents for a period of six months or less prior to being returned to the mother, and that at some point during that period the step-father was incarcerated. *Finck,* 179 Ariz. at 405, 880 P.2d at 625, *rev'g* 177 Ariz. 417, 419, 868 P.2d 1000, 1002 (App.1993). Regardless, an award of in loco parentis visitation to the grandmother while the mother fulfilled her parental role would impermissibly result in an additional "parent" under the Dissent's view.

6. Arizona Revised Statutes ("A.R.S.") section 25–415 (2000) is referred to throughout this dissent as the ILP statute. The definition of in loco parentis is found in A.R.S. § 25–415(G)(1).

*Table of Contents*

I. The Statute and the Issues.......................................... ¶ 27
II. Key Facts and the Trial Court's Ruling .................................. ¶ 32
III. Standards for Statutory Analysis ..................................... ¶ 38
IV. Plain Language...................................................... ¶ 41
    A. The Definition of "Parent" in Arizona cases ......................... ¶ 43
    B. The Definition of the Term "Parent" in Legislation...................... ¶ 45
    C. Dictionary Definitions of "Parent" ................................. ¶ 52
    D. Other Common Law Definitions of "Parent".......................... ¶ 56
    E. Summary Regarding Arizona's Definition of "Parent" .................. ¶ 59
V. "Subject Matter" ................................................... ¶ 62
VI. "Policy" and "Context" .............................................. ¶ 67
VII. "The Evil It Was Designed to Address"................................. ¶ 77
    A. Direct Legislative History ......................................... ¶ 78
    B. *Finck v. O'Toole* ................................................ ¶ 81
VIII. The "Effects and Consequences" of Utilizing the Alternative Definition of
Parent ............................................................ ¶ 97
    A. Same-Sex Parenting .............................................. ¶ 99
    B. Polyamory or Group Relationships ................................. ¶ 102
    C. The Impact on Marriage........................................... ¶ 107
    D. Representative Democracy......................................... ¶ 112
IX. "Serious Constitutional Problems" ................................... ¶ 116
X. Summary of Statutory Analysis and Application to the Facts ............. ¶ 120
XI. The Majority's Response.............................................. ¶ 129
    A. Additional Parents ............................................... ¶ 130
    B. Equating "Parent" with In Loco Parentis ............................ ¶ 139
    C. Additional Requirements to the Plain Language ...................... ¶ 141
    D. The "Treated As" Language ....................................... ¶ 144
    E. Other Claims.................................................... ¶ 146
XII. Conclusion ........................................................ ¶ 153

## I.

### The Statute and the Issues

¶ 27 In 1997 the legislature passed the ILP statute in order to allow persons "other than a legal parent" to qualify for custody and visitation rights with children to whom they had no biological or adoptive relationship. A.R.S. § 25–415(A), (C) & (D).[7] Unless the person was a grandparent or great-grandparent requesting visitation, the legislature provided that such persons must be "in loco parentis." *Id.* The legislature defined in loco parentis as follows:

"In loco parentis" means a person who has been *treated as a parent* by the child and who has formed a meaningful *parental re-*

*lationship* with the child for a substantial period of time.

A.R.S. § 25–415(G)(1) (emphasis added). As to any person other than a grandparent or great-grandparent, the person must show they are in loco parentis regardless of whether they are seeking custody or visitation. A.R.S. § 25–415(A)(1) & (D).[8] The legislature did not provide one definition of in loco parentis for when a person was seeking custody and a different definition of in loco parentis for when a person was seeking visitation. It gave one statutorily mandated definition applicable to both. The definition included the requirement that the person be "treated as a parent by the child" and have a

---

7. For context and reference, the entire ILP statute is attached as an appendix to this dissent.

8. As to custody, the ILP statute provides in pertinent part:

A child custody proceeding may also be commenced in the superior court by a person *other than a legal parent* ... if it finds that ... 1. the person filing the petition *stands in loco parentis to the child.*

A.R.S. § 25–415(A)(1) (emphasis added). As to visitation, pertinent portions of the ILP statute provide:

A grandparent, great-grandparent or *a person who stands in loco parentis to a child* may bring a proceeding for visitation rights with a child[.]

A.R.S. § 25–415(D). Thus, as to both custody and visitation (unless one is a grandparent or great-grandparent seeking solely visitation) a person must be in loco parentis. A.R.S. § 25–415(G)(1).

"meaningful parental relationship with the child." A.R.S. § 25–415(G)(1).

¶ 28 In providing this definition of in loco parentis, however, the legislature did not expressly define the key constituent terms: "parent" and "parental relationship." When the ILP statute was passed, our case law expressly held the "ordinary and usual" meaning of the term "parent" was "one who begets or brings forth an offspring ... the natural father and mother." *Sailes v. Jones,* 17 Ariz.App. 593, 596, 499 P.2d 721, 724 (1972) (quoting *Nunn v. Nunn,* 81 N.M. 746, 473 P.2d 360, 361–62 (1970)). Stepmother argues that an alternative definition of "parent" should apply: "a person who brings up and cares for another."[9] Paraphrasing and inserting the two differing definitions of "parent" into the ILP statute gives the following results:

> "In loco parentis" means a person who has been treated by the child [*as the child's mother* or *the child's father*] and who has formed a meaningful parental relationship with the child for a substantial period of time;

or

> "In loco parentis" means a person who has been treated by the child [*as one who brings up and cares for the child*] and who has formed a meaningful parental relationship with the child for a substantial period of time.

Which version of the statute to follow, which definition of "parent" to accept, is the first fundamental issue in this case. Depending upon which definition of "parent" is employed, the ILP statute has vastly different meanings. If parent is defined to mean "a person who brings up and cares for another" there is no limitation in the number or gender of persons who may simultaneously parent a child. On the other hand, if parent is defined as "one who begets or brings forth an offspring" then there are both gender and number limitations. There may only be two persons (one man as a father and one woman as a mother) who may qualify as parents at the same time for a child. They need not be the legal parents, but they are nevertheless limited in number and by gender.

¶ 29 There is a second fundamental question that underlies not only which definition of parent to employ, but also goes to the legislature's intent with regard to the ILP statute. The second question is this: By enacting the ILP statute did the legislature intend to permit *additional* parents for the same child or did the legislature intend to allow for persons not biologically related to *take the place of* parents who were not filling that role. Stated differently, the issue is whether the legislature intended to authorize new family structures incorporating *additional parents,* even though existing parents were already functioning, or whether it intended to leave family structure alone but statutorily recognize others who *take the place of* parents within that family structure when the biological or adoptive parents (legal parents) were not fulfilling these duties.

¶ 30 If one concludes that the legislature intended the term "parent" within the ILP statute to mean "one who begets or brings forth an offspring," the question of whether additional parents are permitted answers itself. They are not. The limitations in number and gender (one man as a father and one woman as a mother) preclude additional parents. However, if one adopts the alternative definition of parent ("one who brings up and cares for another") then we must decide whether the person or persons seeking ILP custody or visitation took the place of the parent or acted as an additional parent.

¶ 31 This dissent considers the factors of required statutory analysis and concludes that the definition of "parent" in the ILP statute which the legislature intended was that which was commonly used in Arizona at the time: "one who begets or brings forth an offspring." This dissent also concludes that regardless of which definition of "parent" is employed, the legislature intended that the ILP statute apply to those who had, at least for some period of time, *taken the place of* parents, not acted in support of or in addition to already functioning parents.

9. The phrase quoted is a portion of the definition of "parent" from Merriam-Webster's Collegiate Dictionary 842 (10th ed.2001)("1 a: one that be-gets or brings forth offspring b: a person who brings up and cares for another.").

## II.

### Key Facts and the Trial Court's Ruling

¶ 32 The key facts for our purposes are undisputed. Cody was five years old when his parents were divorced.[10] Custody was disputed. Joint legal custody was awarded to mother and father. Father had primary physical custody and mother had parenting time every other weekend, one evening a week, and extended time during school vacations. Mother fully utilized her parenting time.

¶ 33 Father subsequently remarried. For a period of approximately two years (until father's untimely death),[11] when Cody was at father's home, as opposed to mother's home, he lived with stepmother as well as father. Stepmother was actively and appropriately involved in Cody's life. At the same time, however, mother was fully engaged as Cody's mother.

¶ 34 The factual record is clear that stepmother did not replace Cody's mother; both were involved in their distinct roles. The claim, however, is that by being actively involved as a "stepparent," stepmother qualified as a "parent" under the ILP statute even though Cody already had a mother and a father who loved him, cared for him, and were clearly fulfilling their parental roles. In essence, stepmother's claim at the trial court and here is that Cody had more than two "parents" and that we should now recognize stepmother as a third, additional "parent."

¶ 35 In ruling on stepmother's claim, the trial court distinguished between the differing roles of a "parent" and a "stepparent." It found that stepmother did not meet her burden of showing that "[the child] has treated her as a *parent* and that she has formed a meaningful *parental* relationship with [the child]." (Emphasis added.) Rather, the trial court found that stepmother "has shown that she was a caring and supportive *step-parent*." (Emphasis added.) The trial court deter-

mined that "[the child's] natural mother and father fulfilled the rights and responsibilities of parents while [stepmother] played a supportive role to her husbands [sic] role of father to [the child]."

¶ 36 In determining the meaning of the ILP statute, the trial court stated that it did not think the legislature intended for in loco parentis status "in every stepparent relationship where it was a good relationship, as it is here." The trial court considered that such an interpretation would "make most every stepparent one who stands in loco parentis to the child." The trial court went on to conclude that the legislature was "looking or asking for something beyond a . . . normal healthy stepparent stepchild relationship."

¶ 37 As the trial court reasoned, the legislature did not grant blanket authority to allow custody or visitation to any stepparent who could show that such visitation, or custody, would be in the child's best interest. A.R.S. § 25–415(C). Best interests alone would not suffice. *Id.* The legislature required that the stepparent must also be in loco parentis. *Id.*; A.R.S. § 25–415(G)(1). The statutory definition could not be ignored. The step-parent must be "treated as a *parent.*" *Id.* (emphasis added).

## III.

### Standards for Statutory Analysis

¶ 38 In determining the meaning of a statute, our supreme court has instructed: "In interpreting a statute, we first look to the language of the statute itself. Our chief goal is to ascertain and give effect to the legislative intent." *Scottsdale Healthcare, Inc. v. Ariz. Health Care Cost Containment Sys. Admin.*, 206 Ariz. 1, 5, ¶ 10, 75 P.3d 91, 95 (2003) (citing *Zamora v. Reinstein*, 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996)). The supreme court further directs that "[i]n discerning legislative intent, we look to the stat-

---

10. Cody Riepe was born on May 24, 1995. His parents were Brandy Jo Riepe ("mother") and David Alan Riepe ("father"). The divorce was finalized on September 15, 2000.

11. Father developed a relationship with Janette Rae Smith ("stepmother"). In January 2000,

father and Cody moved in with stepmother and her three children. In May 2001, stepmother and father were married. In November 2001, tragically, father was killed in an automobile accident.

ute's policy, the evil it was designed to address, its words, context, subject matter, and effects and consequences." *Logan v. Forever Living Prods. Int'l, Inc.*, 203 Ariz. 191, 194, ¶ 10, 52 P.3d 760, 763 (2002) (citation omitted).

¶ 39 With limited exceptions, "if the language is clear and unambiguous, we apply it without using other means of statutory construction." *Calik v. Kongable*, 195 Ariz. 496, 498, ¶ 10, 990 P.2d 1055, 1057 (1999). If a "plain language" analysis is insufficient, we examine the broader range of factors just described. *Aros v. Beneficial Ariz., Inc.*, 194 Ariz. 62, 66, 977 P.2d 784, 788 (1999). We also have a duty to construe a statute in a constitutional fashion. *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 272, 872 P.2d 668, 676 (1994). We must consider whether one interpretation or another "raise[s] serious constitutional problems." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988).

¶ 40 Following the prescribed framework, this dissent proceeds by analyzing the following factors in this order:

- plain language, *Scottsdale Healthcare*, 206 Ariz. at 5, ¶ 10, 75 P.3d at 95;
- "subject matter," *Logan*, 203 Ariz. at 194, ¶ 10, 52 P.3d at 763;
- "policy" and "context," *id.;*
- "evil it was designed to address," *id.;*
- "effects and consequences," *id.;* and
- "serious constitutional problems." *Edward J. DeBartolo*, 485 U.S. at 575, 108 S.Ct. 1392.

## IV.

### Plain Language

¶ 41 In construing a statute "[w]e give words their usual and commonly understood meaning *unless the legislature clearly intended a different meaning*." *State v. Korzep*, 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990) (citation omitted) (emphasis added). We assume that the legislature is aware of our case law. *Taylor v. Travelers Indem. Co. of Am.*, 198 Ariz. 310, 317, ¶ 21, 9 P.3d 1049, 1056 (2000). We must examine how

"the words of the statute were understood *at the time* the legislation was enacted." *Id.* (citing *Kriz v. Buckeye Petroleum Co.*, 145 Ariz. 374, 377, 701 P.2d 1182, 1185 (1985)) (emphasis added).

¶ 42 The critical terms at issue in this case are "parent" and "parental relationship." I focus on the term "parent" as opposed to "parental relationship" not because one term is more important than another, but because "parental relationship" is still tied to a definition of the root term "parent." This dissent now looks at the common usage of the term "parent" in Arizona cases and statutes, and then turns to dictionaries and the jurisprudence of other states.

### A. The Definition of "Parent" in Arizona Cases

¶ 43 In Arizona, at the time of the ILP statute's passage, the term "parent" was consistently defined as follows:

It is well settled that unless the contrary appears, statutory words are presumed to be used in their ordinary and usual sense and with the meaning commonly attributable to them. *The word "parents" used in its ordinary and usual sense means one who begets or brings forth an offspring,* and usually denotes consanguinity rather than affinity. Also it commonly refers to the natural father and mother, to blood relation.

. . . .

We are in agreement with the cases which have defined "parent" to mean "one who begets offspring."

*Sailes,* 17 Ariz.App. at 596–97, 499 P.2d at 724–25 (emphasis added) (citations omitted) (quoting, in part, *Nunn,* 473 P.2d at 361–62). This was the accepted usage of the term as expressed in numerous other cases. *See Hurt v. Superior Court of State of Ariz. ex rel. Maricopa County,* 124 Ariz. 45, 47–48, 601 P.2d 1329, 1331–32 (1979) (referring to "parents" as "father" and "mother"); *McFadden v. McFadden,* 22 Ariz. 246, 251, 196 P. 452, 453 (1921) (equating the term "parenthood" with "the father and mother"); *Finck v. Superior Court,* 177 Ariz. 417, 421, 868 P.2d 1000, 1004 (App.1993), *aff'd sub*

*nom. Finck v. O'Toole,* 179 Ariz. 404, 880 P.2d 624 (1994)[12] (stating that the legal meaning of " 'parent' in the domestic relations statutes is a biological or adoptive parent"); *Hughes v. Creighton,* 165 Ariz. 265, 268, 798 P.2d 403, 406 (App.1990) (recognizing the common usage of a parent as "one who begets offspring"); *State v. Wilhite,* 160 Ariz. 228, 229–30, 772 P.2d 582, 583–84 (App. 1989) (acknowledging that definition of "parent" as "one who begets offspring" was common usage); *Anguis v. Superior Court,* 6 Ariz.App. 68, 429 P.2d 702 (1967) (equating the term "parents" with "natural parents").

¶ 44 Arizona case law that did not expressly define "parent" consistently used the term to refer to either one or "both" parents, thereby limiting the number of parents to two as opposed to three or more. *See, e.g., State v. Bean,* 174 Ariz. 544, 546, 851 P.2d 843, 845 (App.1992) (referring to "one parent" and "the other parent"); *Boulder County Dep't of Soc. Servs. ex. rel Harkreader v. Harkreader,* 164 Ariz. 123, 125–26, 791 P.2d 649, 651–52 (App.1990) (same); *Anderson v. Anderson,* 121 Ariz. 405, 407, 590 P.2d 944, 946 (App.1979) (referring to "one parent or the other" and "both parents"); *Morales v. Glenn,* 114 Ariz. 327, 329, 560 P.2d 1234, 1236 (1977) (referring to "both parents" and choosing "between the two"); *Ex parte Winn,* 48 Ariz. 529, 535–36, 63 P.2d 198, 201 (1936) (referring to "father" and "mother" as "parents" and to "either or both"). There is no suggestion in the Arizona cases prior to the passage of the ILP statute that two persons of the same gender would qualify under the commonly understood usage of the term "parent." Thus, the "usual and commonly understood meaning," *e.g., Korzep,* 165 Ariz. at 493, 799 P.2d at 834, of the term "parent" in Arizona cases was "one who begets or brings forth offspring."

### B. The Definition of the Term "Parent" in Legislation

¶ 45 It is also appropriate to look at the Arizona legislature's use of the term "parent" in other settings to understand the legislature's use of that term here. *See People's Choice TV Corp. v. City of Tucson,* 202 Ariz. 401, 403, ¶ 8, 46 P.3d 412, 414 (2002) (quoting *In re Robert A.,* 199 Ariz. 485, 487, ¶ 8, 19 P.3d 626, 628 (App.2001) ("We 'look to statutes on the same subject matter to determine legislative intent and to maintain statutory harmony.' ")).

¶ 46 The statutes pertaining to adoption give guidance as to what the legislature meant by the term "parent." By statute, the Arizona legislature provided for adoption whereby adults not biologically related to children may become "parents." A.R.S. § 8–117 (Supp.2003). In creating the "relationship of parent and child" by means of adoption, the legislature referred to creating the "natural relationship of child and parent." A.R.S. § 8–117(A) (emphasis added).[13] The *"natural* relationship of child and parent" is tied to gender: one man as a father and one woman as a mother. It is not reflected in a definition of parent that allows for multiple adults without reference to number and gen-

---

12. *Finck v. O'Toole* is sometimes referred to hereinafter as *"Finck "* or as *"Finck v. O'Toole ."* This is to distinguish this case from its predecessor *Finck v. Superior Court.*

13. The full text of the pertinent statute reads as follows:

  A. On entry of the decree of adoption, the relationship of parent and child and all the legal rights, privileges, duties, obligations and other legal consequences of the natural relationship of child and parent thereafter exist between the adopted child and the adoptive parent as though the child were born to the adoptive parent in lawful wedlock. The adopted child is entitled to inherit real and personal property from and through the adoptive parent and the adoptive parent is entitled to inherit real and personal property from and through the adopted child the same as though the child were born to the adoptive parent in lawful wedlock.

  B. On entry of the decree of adoption, the relationship of parent and child between the adopted child and the persons who were the child's parents before entry of the decree of adoption is completely severed and all the legal rights, privileges, duties, obligations and other legal consequences of the relationship cease to exist, including the right of inheritance. This subsection does not apply to communication rights established pursuant to § 8–116.01.

  C. If the adoption is by the spouse of the child's parent, the relationship of the child to that parent remains unchanged by the decree of adoption.

  A.R.S. § 8–117(A), (B) & (C).

der. Further, portions of subsection A that refer to "lawful wedlock" make this even more clear.

¶ 47 Subsection A expressly creates a relationship "between the adopted child and the adoptive parent *as though the child were born* to the adoptive parent *in lawful wedlock.*" *Id.* (emphasis added). Tying the term "parent" to "lawful wedlock" creates, in Arizona, a specific correlation to the gender of the parents. In Arizona, the legislature has decreed "[a] valid marriage is contracted by a *male* person and a *female* person." A.R.S. § 25–125(A) (2000) (emphasis added). The legislature has been explicit that "[m]arriage between persons of the *same sex* is void and prohibited." A.R.S. § 25–101(C) (2000) (emphasis added).[14] Thus, the legislature's use of the term "parent" in creating a parent-child relationship explicitly tied to "lawful wedlock" clearly establishes family structure in Arizona based directly on a definition of parent as one man as a father and one woman as a mother.

¶ 48 The legislature's use of the term "parent" in setting forth the *effect* of an adoption on a biological parent also reinforces a construction of the term parent with limitations on gender and number. When a decree of adoption is entered in Arizona, the statute provides that "the relationship of parent and child" between a child and his former parents "is completely severed," with one significant exception. A.R.S. § 8–117(B) & (C). Thus, under the general rule, this provision makes clear that there can be no more than one parent of the same gender per child. The one exception to the general rule reinforces this. The exception is where "the adoption is by the spouse of the child's parent." A.R.S. § 8–117(C) (emphasis added). In that case, "the relationship of the child to that parent remains unchanged by the decree of adoption." *Id.*

¶ 49 The important language for our purposes in this statute is the reference to "the *spouse* of the child's parent." *Id.* (emphasis added). Given Arizona's prohibition against same-sex marriage, there can be no "*spouse* of the child's parent" that is of the same *gender* as "the child's *parent.*" *Id.* "Parents," as defined in this setting, may thus be only one man as a father and one woman as a mother.

¶ 50 Other Arizona statutes use the term "parents" to impliedly (or directly) limit that term to no more than two persons, and in some instances specifically reference gender as well. *See, e.g.,* A.R.S. § 8–531(12) (1999) (in the context of termination of parental rights, " '[p]arent' means the natural or adoptive *mother* or *father* of a child") (emphasis added); A.R.S. § 13–1302 (2001) (dealing with custodial interference and referencing "the child's *parent* " and "the *other* parent") (emphasis added); A.R.S. § 14–2302 (1995) (dealing with children omitted from wills and referencing "the *testator* ... [and] the *other* parent") (emphasis added); A.R.S. § 15–1801 (2002) (defining "parent," for purposes of tuition classification, as "a person's *father* or *mother,* or if one parent has custody, that parent, or if there is no surviving parent or the whereabouts of the parents are unknown, then a guardian") (emphasis added); A.R.S. § 25–320 (Supp.2003) (declaring that a court may order "*either* or *both* parents" to pay child support) (emphasis added); A.R.S. § 25–403(A)(7) (Supp.2003) (referencing "one parent, both parents or neither parent" in custody statute); A.R.S. § 25–408(C) (Supp.2003) (referencing "both parents," "a parent," and "other parent" in statute dealing with custody and relocation of parent).

¶ 51 Thus, the legislature's use of the term "parent" in other statutes is directly connected to, and limited by, gender and number. This is consistent with the definition in prior Arizona cases that construes parent as "one who begets offspring."

---

**14.** The legislature emphasized the importance of the tie to gender (no more than one person of each gender) by also providing that "[m]arriages valid by the laws of the place where contracted are valid in this state, *except marriages that are void and prohibited by § 25–101* [same-sex marriages]." A.R.S. § 25–112(A) (2000) (emphasis added). Thus, one could not argue that a parent-child relationship with parents of the same sex was created by "lawful wedlock" in another state because such marriages (and parent-child relationships based on such marriages) are not valid under § 25–112(A).

### C. Dictionary Definitions of "Parent"

¶ 52 When language, such as the term "parent," is not expressly defined we may also consider definitions from accepted dictionaries. *See State v. Wise,* 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983) (referring to "established, widely respected dictionary" because terms were not defined in the statute and there was "no indication that the Legislature intended that either word be given an extraordinary meaning"); *Lake Havasu City v. Ariz. Dep't of Health Serv.,* 202 Ariz. 549, 553, ¶ 16, 48 P.3d 499, 503 (App. 2002) (considering common dictionary definitions because the statute failed to define terms).

¶ 53 Arizona's definition of parent, "one who begets or brings forth offspring," is the same as the primary dictionary definition of a parent. *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY 1776 (2d ed.1935) (a parent is "[o]ne who begets, or brings forth, offspring"); RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1410 (2d ed., unabridged, 1987) (defining "parent" as "a father or mother"); OXFORD ENGLISH DICTIONARY vol. XI 222 (2d ed.1989) (a parent is "[a] person who has begotten or borne a child; a father or mother").

¶ 54 On the other hand, dictionaries have also given broader and secondary definitions to the term parent. For instance, one dictionary gives a definition as follows: "1 a: one that begets or brings forth offspring b: *a person who brings up and cares for another.*" MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 842 (10th ed.2001) (emphasis added). This secondary definition alone, without the limitations in gender and number from the primary definition, is what stepmother asserts.

¶ 55 Certainly, bringing up and raising a child is part of being a parent, whether that term is limited by gender and number or not. The question is whether the secondary definition, of bringing up and caring for another, should act to exclude the primary definition which includes limits on gender and number.

There is no contention that the primary definition does not also maintain as a sub-part the requirement that the person bring up and care for another. The question is whether it was intended by the legislature that this secondary definition stand alone.

### D. Other Common Law Definitions of "Parent"

¶ 56 Arizona's definition of parent as "one who begets or brings forth offspring" also parallels a definition frequently used in the broader common law. In Black's Law Dictionary, "parent" is defined as follows:

> 1. *The lawful father or mother of someone.* ● [15] In ordinary usage, the term denotes more than responsibility for conception and birth. The term commonly includes (1) either the natural father or the natural mother of a child, (2) the adoptive father or adoptive mother of a child, (3) a child's putative blood parent who has expressly acknowledged paternity, and (4) an individual or agency whose status as guardian has been established by judicial decree. In law, parental status based on any criterion may be terminated by judicial decree.

BLACK'S LAW DICTIONARY 1137 (7th ed.1999) (emphasis added). Another legal encyclopedic reference defining "parent" gives a similar definition:

> The word "parent" usually denotes consanguinity [blood relationship] rather than affinity, and when the term is literally interpreted, and *in its common and accepted meaning,* it *refers to the natural father or mother,* and it can only include a father and mother related by blood to the child; it does not mean parents artificially created by law. Thus, in the strict sense, the term does not include an adoptive father or mother, a stepfather or stepmother, and persons standing in loco parentis.

67A C.J.S. *Parent* (1978).

¶ 57 Jurisdictions outside Arizona define "parent" in different ways. Many jurisdic-

---

**15.** The information following the bullet is not part of the definition of the term. As explained in Black's Law Dictionary, "[b]ullets are used to separate definitional information (before the bul-

let) from information that is not purely definitional (after the bullet), such as encyclopedic information or usage notes." BLACK'S LAW DICTIONARY xviii (7th ed.1999).

tions either presently utilize, or have utilized in the past, the primary definition of parent that is limited in number and by gender. *See In re Frist's Estate,* 161 A. 918, 920 (Del.Ch.1932) ("Parent means father and mother."); *Hood v. S. Ry. Co.,* 169 Ga. 158, 149 S.E. 898, 898 (1929) (quoting *Atlanta & West Point Ry. Co. v. Venable,* 65 Ga. 55 (1880)) (stating that "parent" means either father or mother); *Weems v. Saul,* 52 Ga. App. 470, 183 S.E. 661, 661 (1936) ("The word 'parent' means the lawful father or mother."); *Marshall v. Indus. Comm'n,* 342 Ill. 400, 174 N.E. 534, 535 (1931) (stating that a "parent" is one who "begets, or brings forth, offspring," and includes mother of illegitimate child); *Smith's Ex'r v. Smith,* 65 Ky. (2 Bush) 520 (1866) (defining "parent" as "father or mother, he or she that produces young"); *Hendy v. Indus. Accident Bd.,* 115 Mont. 516, 146 P.2d 324, 325 (1944) ("The word parent means one who generates a child, a father or mother . . . the lawful father or mother by blood and not a stepfather or stepmother or one standing in loco parentis."); *State v. Napoleon,* 37 N.J.Super. 595, 117 A.2d 654, 656 (1955) (noting that a "parent" is "one who begets or brings forth," a mother or father); *Gardner v. Hall,* 132 N.J. Eq. 64, 26 A.2d 799, 805 (1942) (same); *Nunn,* 473 P.2d at 362 (holding that statutory term "parent" means only natural parents); *Dodson v. Ward,* 31 N.M. 54, 240 P. 991, 994 (1925) (citations and quotations omitted) (noting that "parent" means natural parent, "[o]ne who begets, or brings forth, offspring; a father or mother"); *Commonwealth v. Wibner,* 73 Pa.Super. 349 (1919) (citing *Snyder v. Greendale Land Co.,* 48 Ind.App. 178, 91 N.E. 819 (1910)) (holding that a "parent" is a "father or mother," or "one who begets or brings forth offspring"); *Boudreaux v. Tex. & N.O.R. Co.,* 78 S.W.2d 641, 643–44 (Tex.Civ.App.1935) (defining "parent" as "[o]ne who has generated a child[,][a] father or mother"); *McDonald v. Tex. Employers' Ins. Ass'n,* 267 S.W. 1074, 1075 (Tex.Civ.App.1924) (primary meaning of "parent" is "one who procreates, begets, or brings forth offspring, as father or mother").

¶ 58 In other jurisdictions, courts and legislatures have expanded upon the definition of "parent" and do not have gender and number limitations. *See, e.g., In re Hart,* 806 A.2d 1179 (Del.Fam.Ct.2001) (permitting gay life partner to adopt the children of partner because statutory object of helping children requires liberal construction); *E.N.O. v. L.M.M.,* 429 Mass. 824, 711 N.E.2d 886, 891 (1999) ("A child may be a member of a nontraditional family in which he is parented by a legal parent and a de facto parent," that has "no biological relation to the child, but has participated in the child's life as a member of the child's family."); *V.C. v. M.J.B.,* 163 N.J. 200, 748 A.2d 539, 554–55 (2000) (expanding the statutory definition of "parent" to include a "psychological parent"); *see also* PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS (hereinafter "ALI PRINCIPLES") § 2.18 cmt. c (2002) (stating that "[c]ourts have traditionally had difficulty with claims to children that, if recognized, would result in more than one mother, or more than one father, of the child," but asserting that "[t]he trend is reversing").

### E. Summary Regarding Arizona's Definition of "Parent"

¶ 59 Returning now to the principles of statutory interpretation, "[w]e give words their usual and commonly understood meaning unless the legislature clearly intended a different meaning." *Korzep,* 165 Ariz. at 493, 799 P.2d at 834. At the time, Arizona law expressly defined "parents" in the "ordinary and usual sense" as "one who begets or brings forth an offspring." *Sailes,* 17 Ariz. App. at 596, 499 P.2d at 724. This is consistent with legislative use of the term and primary definitions in dictionaries. Arizona's definition is consistent with some jurisdictions. It is inconsistent with others.

¶ 60 Based on Arizona's longstanding, consistent use of the term "parent" to mean "one who begets or brings forth an offspring", on a plain language analysis, one would apply that definition in construing the statute. Those who "beget or bring forth" a child are commonly understood to be one man as a father and one woman as a mother. Applying this definition results in a construction of the ILP statute that is limited to one person of each gender as a parent. This

definition answers the question of whether the ILP statute was intended to provide *additional* parents or for those who *take the place of* parents. There are no additional parents. It also answers the question of whether the legislature intended to change family *structure* or to leave family structure alone but provide for changes *within that structure* when others were being "treated as a parent by the child." Family structure remains. Thus, on a plain language analysis, the trial court was correct in applying A.R.S. § 25–415(G)(1). Stepmother did not take the place of the mother and should not be entitled to visitation because she was not in loco parentis as that term is defined in Arizona law.

¶ 61 Because one may consider the term "parent" to have the alternative meaning, I now turn to the broader analysis of the factors set forth in *Logan*, 203 Ariz. at 194, ¶ 10, 52 P.3d at 763, and related cases.

## V.

### *"Subject Matter"*

¶ 62 When construing a statute we are to consider the "subject matter." *Id.* As the Arizona Supreme Court noted:

> If the statutes relate to the same subject or have the same general purpose ... they should be read in conjunction with, or should be construed together with other related statutes, as though they constituted one law.... *This rule of construction applies even where the statutes were enacted at different times, and contain no reference one to the other.*

*State v. Sweet*, 143 Ariz. 266, 270–271, 693 P.2d 921, 925–926 (1985) (quoting *State ex rel. Larson v. Farley*, 106 Ariz. 119, 122, 471 P.2d 731, 734 (1970)) (emphasis added).

¶ 63 The subject matter of the ILP statute relates directly to the structure of families. The state has a substantial interest in strengthening families. Our decisions make that clear: "The state has an interest in promoting healthy family relationships that enable children to become well-adjusted, responsible adults." *Graville v. Dodge*, 195 Ariz. 119, 125, ¶ 26, 985 P.2d 604, 610 (App. 1999). "The health of the family is critical to

the health and vibrancy of our communities and our state." *Woodworth v. Woodworth*, 202 Ariz. 179, 183, ¶ 22, 42 P.3d 610, 614 (App.2002). We have recognized the importance "of the family ... without which there would be neither civilization nor progress." *Moran v. Moran*, 188 Ariz. 139, 144, 933 P.2d 1207, 1212 (App.1996) (quoting *Maynard v. Hill*, 125 U.S. 190, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888)).

¶ 64 As set forth in part above, *supra* ¶¶ 45–51 dealing with the definition of "parent," the legislative scheme for families is limited by gender and number. The scheme for adoption expressly refers to a "relationship of parent and child" that is based upon the "natural relationship of child and parent." A.R.S. § 8–117(A). The relationship created is "as though the child were born to the adoptive parent in lawful wedlock." *Id.* As discussed already, our statutes limit "lawful wedlock" to a "male person and a female person." A.R.S. § 25–125(A). This family structure has gender and number limitation for parents.

¶ 65 Arizona's paternity and parental termination statutes also recognize parent and child relationships that have express gender and number limitation. A.R.S. § 25–812(A)(1) & (H) (Supp.2003) (stating that paternity can be established if "both parents" acknowledge paternity, but allowing that "[t]he mother or the father may rescind the acknowledgment of paternity"); A.R.S. § 8–531(12) (" 'Parent' means the natural or adoptive mother or father of a child.").

¶ 66 Considering the constraints of the general subject matter, and its limitations on gender and number when referring to family structure, this is a factor that weighs in favor of an interpretation of the statute that does not allow for additional parents and that continues the gender and number limitations in other statutes dealing with family structure.

## VI.

### *"Policy" and "Context"*

¶ 67 When considering the use of the term "parent" in the ILP statute, and the meaning

of that statute, we are to consider "the statute's policy [and] context." *See Logan*, 203 Ariz. at 194, ¶ 10, 52 P.3d at 763. The broader policy and context point is that Arizona's statutes on family structure have gender and number limitation, as described above. The point here is that in construing the ILP statute the legislature chose not to recognize positions of family status, such as stepparent or step-grandparent. Rather, the legislature focused on the nature of the relationship itself: whether the person was "treated as a parent by the child." A.R.S. § 25–415(G)(1).

¶ 68 In assessing the policy and context for the term "parent" and the ILP statute, it is necessary to examine how the ILP statute deals with both custody and visitation, and how it treats different designations of family status, i.e., grandparent and great-grandparent as contrasted with stepparents and step-grandparents. Under Arizona's ILP statute, a person "other than a legal parent" may seek visitation or custody of a child. A.R.S. § 25–415(A) & (C). A "legal parent" is defined as "a biological or adoptive parent whose parental rights have not been terminated." A.R.S. § 25–415(G)(2). Thus, it is clear that the intent of the statute was to provide custody and visitation for persons who are *not* biological or adoptive parents. There are, however, important distinctions in how the ILP statute deals with custody and visitation that are pertinent here. In particular, as to visitation (but not custody) there are specified categories of persons (grandparents and great-grandparents) who may be granted rights regardless of whether they are "treated as parents." This distinction has meaning here.

¶ 69 In terms of visitation, directly at issue here, the scheme provides that "[t]he superior court may grant a person who stands in loco parentis to a child, including grandparents and great-grandparents, who meet the requirements of section 25–409" reasonable visitation upon certain conditions. A.R.S. § 25–415(C). The statute further provides that "[a] grandparent, a great-grandparent, *or* a person who stands in loco parentis to a child may bring a proceeding for visitation rights with a child." A.R.S. § 25–415(D) (emphasis added). Section 25–415(D) is in the *disjunctive*. Specifically, a grandparent or great-grandparent can seek visitation with a child *even though* that grandparent or great-grandparent is *not* in loco parentis to the child.

¶ 70 The disjunctive is critical because it identifies persons "other than a legal parent" by categories of family status or position. For visitation, if a "best interests" test is passed, the statute provides for separate treatment based on biology (or adoptive lineage) alone. This distinction is also confirmed by the presence of a separate statute, A.R.S. § 25–409 (Supp.2003). That statute makes it clear that grandparents and great-grandparents can have visitation with a child *without* being in loco parentis:

A. The superior court may grant the grandparents of the child reasonable visitation rights to the child during the child's minority on a finding that the visitation rights would be in the best interests of the child and any of the following is true:

1. The marriage of the parents of the child has been dissolved for at least three months.

2. A parent of the child has been deceased or has been missing for at least three months. . . .

3. The child was born out of wedlock.

B. The superior court may grant the great-grandparents of the child reasonable visitation rights on a finding that the great-grandparents would be entitled to such rights under subsection A if the great-grandparents were grandparents of the child.

A.R.S. § 25–409(A) & (B). In other words, a grandparent or great-grandparent does not need to *take the place* of a parent in order to obtain visitation rights. They can obtain those rights on a finding that (1) it is in the best interests of the child and (2) the parents' marriage has been dissolved for at least three months, one parent is deceased or missing, or the child was born out of wedlock. Certainly, one manner in which the legislature could give stepparents this same right (visitation *without* taking the place of a parent) would be to amend this statute to so provide. The current statute, however, does not allow that. A stepparent must be in loco

parentis, which includes being "treated as a *parent* by the child." A.R.S. § 25–415(G)(1).

¶ 71 Turning now to custody, there is no distinction between persons of a particular family status, i.e., grandparents and great-grandparents, as contrasted with all persons "other than a legal parent." The distinction created for purposes of visitation disappears. Custody has always been viewed as a much more significant intrusion upon the rights of a parent than visitation. *Graville,* 195 Ariz. at 125, ¶ 23, 985 P.2d at 611 (upholding grandparent visitation statute in part because visitation is less intrusive than custody and thus less invasive of parental rights); *see also Soos v. Superior Court,* 182 Ariz. 470, 474, 897 P.2d 1356, 1360 (App.1994) ("A parent's right to the custody and control of one's child is a fundamental interest. . . .").

¶ 72 Against the backdrop of this more significant intrusion on parental rights, the preferential statutory treatment for grandparents and great-grandparents for custody has been statutorily removed. No longer does a best interests test suffice, as it does with visitation. A.R.S. § 25–415(A). The grandparent and/or great-grandparent must show, among other things, that he or she is in loco parentis, which includes being "treated as a *parent* by the child" not treated as a *grandparent.* A.R.S. § 25–415(A)(1) & (G)(1) (emphasis added). The statute simply does not call out any particular positions of family status for special treatment. It treats all persons alike and provides that "[a] child custody proceeding may also be commenced in the superior court by a person other than a legal parent by filing a verified petition." A.R.S. § 25–415(A).

¶ 73 The policy and context point, for purposes of statutory analysis, is this: The legislature has expressly defined circumstances in which there is no impediment to more than one person of the same gender and more than two people having court-ordered visitation rights with a child. To qualify for such a departure from the family structure, however, the person must be a grandparent or great-grandparent and it must be in the best interests of the child.

¶ 74 For whatever reason, the legislature did not choose to specifically identify step-parents, as it did grandparents and great-grandparents, as falling outside the requirement of being "treated as a *parent* by the child" not a *stepparent,* for purposes of visitation. A healthy relationship between a child and a stepparent, as important as it is, and even if it was in the "best interests of the child" to preserve, was not called out for special statutory treatment. Only grandparents and great-grandparents were so identified.

¶ 75 No one, I suggest, would contend that a grandparent or great-grandparent would not have to show that he or she was being "treated as a parent by the child" as opposed to a grandparent, in order to obtain custody. It would be erroneous for the court to read-in this preferential treatment to a grandparent or great-grandparent, in spite of the importance of that family relationship. The same principle applies to reading-in the status of a stepparent seeking visitation, and not requiring the stepparent to satisfy the definition of in loco parentis. Notwithstanding the importance of that relationship, we should not do it.

¶ 76 The policy and context for the statute is consistent with the trial judge's conclusion: the ILP statute was not intended to allow for state compelled stepparent visitation unless there was "something beyond a normal healthy stepparent/stepchild relationship." Grandparents and great-grandparents can so qualify, but in the current statute, stepparents cannot. They must be, in the words of the statute, "treated as a *parent* by the child"—not as a *stepparent.* A stepparent must be in loco parentis, even for visitation.

## VII.

### *"The Evil it was Designed to Address"*

¶ 77 In considering the intention of the ILP statute, as well as the meaning of the term "parent" within it, we are to consider the "evil it was designed to address." *See Logan,* 203 Ariz. at 194, ¶ 10, 52 P.3d at 763; *State v. Korovkin,* 202 Ariz. 493, 496–98, ¶¶ 11–18, 47 P.3d 1131, 1134–36 (App.2002) (looking to the evil a statute was designed to remedy in determining legislative intent).

### A. Direct Legislative History

¶ 78 The legislative history states that "the bill is intended for biological families, *which in reality, are no longer, 'families.'*" *Minutes of the Meeting of Comm. on Family Servs.*, Ariz. State Senate, Mar. 19, 1997. The fact sheet pertaining to the bill specifically indicated that the ILP statute was intended to apply "in cases where a child is *essentially raised* by a non-biological parent." Fact Sheet for H.B. 2420, Ariz. State Senate, Mar. 27, 1997 (emphasis added). The minutes also reflect that "*[t]he main intent* is that when the biological parents are not real parents (having a meaningful parental relationship with the child), it allows people to have an opportunity to go before a judge and ask for a chance to take care of the child." *Minutes of Meeting of Comm. on Human Servs.*, Ariz. State House of Rep., Feb. 13, 1997 (emphasis added).

¶ 79 Consistent with this theme, the legislative history shows that the statute's sponsor, Representative Mark Anderson, stated that "Arizona courts have deferred to the Legislature to give them some guidelines *when dealing with a situation where a child's parents are not parenting.*" *Minutes of Meeting of Comm. on Family Servs.*, Ariz. State Senate, Mar. 19, 1997 (emphasis added). This is a reference to the case of *Finck v. O'Toole. See* discussion *infra* ¶¶ 81–96. The history also references *Finck v. O'Toole* in the context of the statute's intended purpose of "dealing with a situation where a child's parents are not parenting." *Id.* A concern raised at the legislature was that there would then be a "best interest contest between the parents and the *in loco parentis.*" *Id.* The response was that "the decision would be left to the court and that *if a parent is truly parenting,* the court's decision will recognize that." *Id.*

¶ 80 Thus, the legislative history expressly recognizes that the "evil [the ILP statute] was designed to address" is a situation where a person had taken the place of a non-existent or non-functioning parent, not to create additional parents.

### B. Finck v. O'Toole

¶ 81 The legislature put *Finck v. O'Toole,* 179 Ariz. 404, 880 P.2d 624 (1994), in the context of dealing with a situation in which "a child's parents are not parenting." The facts in *Finck* are not entirely consistent with this rendition—at least one of the parents in *Finck* resumed parenting. *Finck* merits further scrutiny as to the role it played in bringing about the ILP statute.

¶ 82 In *Finck,* the parents of a presumed father were raising a child that they believed to be their grandson. *Id.* at 405, 880 P.2d at 626. The father was in prison. *Id.* The mother, who was not parenting the child at the time, filed for divorce. *Id.* As part of the divorce proceedings it was learned that the child was not the biological child of the presumed father. *Id.* The presumed grandparents had no biological relationship to the child. Because of this, they now became step-grandparents as opposed to grandparents as they had previously believed.

¶ 83 The father did not respond to the divorce proceedings. *Id.* A default, along with an order of custody of the child, was granted to the mother. *Id.* The step-grandparents refused to turn the child over to the mother but were compelled to do so by means of a separate habeas corpus proceeding. *Id.* at 405 n. 1, 880 P.2d at 625 n. 1. Thus, the custody rights of the step-grandparents to the child were not at issue. The step-grandparents were not parties in *Finck. Id.* at 407 n. 2, 880 P.2d at 627 n. 2. The real party in interest was the child. Based on the recommendation of assigned court personnel (Expedited Visitation Services), the trial court had granted visitation to the step-grandparents. *Id.* at 405, 880 P.2d at 626. The mother filed a special action with regard to the grant of visitation to the step-grandparents. *Id.* She claimed the grant of visitation was outside the jurisdiction of the court as there was no biological relationship between the child and the step-grandparents. *Id.*

¶ 84 Because of the lack of a biological relationship between the child and the step-grandparents, the Arizona Supreme Court in *Finck* determined that the trial court had no statutory authority to award any visitation to

these newly designated step-grandparents. *Id.* at 408, 880 P.2d at 628. This was so even though the child lived with the grandparents (not the mother), the father was in prison, and the grandparents were, in the words of the court, "in loco parentis." *Id.* at 405, 880 P.2d at 625.

¶ 85 First, it is clear that *Finck* was an impetus for passage of the ILP statute. The legislative history notes that "it was constituent concern which brought forth [the bill] and the Arizona Supreme Court decision in *Finck vs O'Toole* in which the Court specifically asked the Legislature to address this issue." *Minutes of the Comm. on Family Servs.*, Ariz. State Senate, Mar. 19, 1997. Indeed, two concurring justices in *Finck* expressly requested that the legislature become involved. *Finck*, 179 Ariz. at 408, 880 P.2d at 628 (Zlaket, J., concurring) (issue "cries out for legislative clarification"); *id.* at 409, 880 P.2d at 629 (Martone, J., concurring) (issue was "ripe for legislative inquiry").

¶ 86 What is critical, then, is the issue from *Finck* that the legislature was addressing. *Finck* can be construed as presenting an issue to the legislature dealing primarily with the visitation rights of a step-*grandparent* as that was directly at issue. However, it can also be viewed, as the concurring justices expressly noted, as dealing with the broader issues of "parents, grandparents, and great-grandparents and ... their counterparts in the stepparent chain." *Id.* at 408, 880 P.2d at 628 (Zlaket, J., concurring). I now discuss both views.

### 1.*Finck v. O'Toole Viewed as Presenting a Grandparent Visitation Issue*

¶ 87 The direct legal issue that the Arizona Supreme Court dealt with was whether step-grandparents had a right to visitation. If that is seen as the "evil the statute was designed to address," *Logan*, 203 Ariz. at 194, ¶ 10, 52 P.3d at 763, to grant visitation rights to step-grandparents, then it cuts against a view of "parent" that is limited by gender and number. The reason is this: both step-grandparents would be granted visitation at a time when the mother had custody. This results in two women and one man being treated as "parents." To adhere

to the gender and number limitations would result in only the step-grandfather, and not the step-grandmother, receiving visitation. This would be contrary to a conclusion that the legislature intended the term "parent" to be limited in number and gender to "one who begets or brings forth an offspring." On this same basis, it also cuts against a conclusion that the ILP statute was not intended to allow for additional parents, as *Finck* would allow for three: mother, step-grandmother, and step-grandfather.

¶ 88 *Finck*, however, is a form of a hybrid, not on all fours with the case here. In *Finck*, the step-grandparents appear to have taken the place of the mother and father for a period of time. The father was in prison, and the child was living with the step-grandparents. The step-grandparents "refused, repeatedly to turn [the child] over to [the mother]." *Finck*, 179 Ariz. at 405 n. 1, 880 P.2d at 625 n. 1. Both the supreme court and the court of appeals noted that the step-grandparents "were acting *in loco parentis* to the child." *Id.; see also Finck v. Superior Court*, 177 Ariz. at 419, 868 P.2d at 1002. The more detailed factual account of the relationship between the child and the step-grandparents is in the court of appeals decision. It provides:

> Darla and Michael had lived with the Fincks from 1983 until 1988, at which time she was asked to leave for alleged drug use and other problems. Darla had the child with her from 1988 until May 1991. She and the child lived with Michael from May to October 1991 in a home purchased for them by the Fincks. In October 1991, Darla moved out again, leaving the child with Michael. Michael and the child eventually moved back in with the Fincks. At some point thereafter Michael became incarcerated again. The Fincks acted *in loco parentis* for the child until April 1992, when the court awarded temporary custody of the child to Darla.

*Finck v. Superior Court*, 177 Ariz. at 419, 868 P.2d at 1002. There are few similarities between the type of relationship that Cody had with his mother in this case (a very stable, nurturing environment) as contrasted with that of the child in *Finck* (putative

father in prison and mother suffering with substance abuse problems). The request for visitation in *Finck* was based on the child's *prior relationship* with the step-grandparents, which appears to have replaced the relationship with both parents.

¶ 89 Thus, if the legislature intended to address a situation that would provide for visitation rights to the step-grandparents, without regard to whether one parent has renewed his or her effort at parenting, that is a factor that weighs in favor of construing the statute to allow for additional parents. It also weighs in favor of using the secondary definition of parent not tied to gender and number. As to the facts of this case, however, that reading does not assist stepmother as there is no factual basis for her to argue that she had a relationship prior to the time of filing the petition that replaced either or both of the parents.

### 2. Reading Finck v. O'Toole as Presenting a Stepparent Issue

¶ 90 Both the *Finck* case itself, however, as well as the legislative history show that the legislature may have been addressing a broader "evil" than one limited to stepgrandparent visitation. Again, the legislative history is clear that the issue from *Finck* that the courts were addressing was what to do in a situation where someone has *taken the place* of a child's parents. *Minutes of Meeting of Comm. on Family Servs.*, Ariz. State Senate, Mar. 19, 1997 (emphasis added). The legislative record shows "that Arizona courts [referencing *Finck*] have deferred to the legislature to give them some guidelines *when dealing with a situation where a child's parents are not parenting*." *Id.* This is consistent with both Justice Zlaket's and Justice Martone's concurring opinions that the issues which need legislative clarifications were the broader issues dealing with "parents, grandparents, greatgrandparents, [and] . . . their counterparts in the stepparent chain." *Finck*, 179 Ariz. at 408, 880 P.2d at 628 (Zlaket, J., concurring); *see also id.* at 409, 880 P.2d at 629 (Martone, J., concurring) ("I agree with Justice Zlaket that the effect of the court's decision on a *stepparent* with an established relationship to a stepchild is ripe for legislative inquiry.")

(emphasis added). This reading of the issue from *Finck* is also consistent with the conflicting lines of authority which the Arizona Supreme Court addressed in *Finck*.

¶ 91 When the Arizona Supreme Court dealt with *Finck* it was faced with two different and conflicting lines of authority from this court. One line of authority was expressed by *Bryan v. Bryan*, 132 Ariz. 353, 645 P.2d 1267 (App.1982), drawing on principles from *Clifford v. Woodford*, 83 Ariz. 257, 320 P.2d 452 (1957). In *Bryan*, the court noted that the stepfather "had been the child's only 'father figure' during . . . most of the child's life." 132 Ariz. at 360, 645 P.2d at 1274. This court determined that "the [trial] court could easily have concluded that the [stepfather] was 'the only genuine father [she had] ever really known.'" *Id.* (quoting *Clifford*, 83 Ariz. at 266, 320 P.2d at 458) (last alteration in original). Accordingly, the trial court awarded custody to the stepfather. He had taken the place of the father.

¶ 92 In *Clifford*, upon which *Bryan* was based, the person who was given rights equivalent to those sought under the ILP statute was also a stepfather who had essentially replaced the natural father as the father of the children at issue. 83 Ariz. at 260–61, 320 P.2d at 454. The squarely presented issue was not whether the stepfather was acting as an *additional* parent or a supportive parent but that he had in fact *taken the place of* the natural father:

> We are of the view that [the natural father]'s lack of interest in his children, his indifference toward them and neglect of them, was such as to justify the trial court in finding [the stepfather the] *only genuine father they have ever really known* [.]

*Id.* at 266, 320 P.2d at 458 (emphasis added). Thus, the stepfather had taken the place of the natural father.

¶ 93 The second, and competing, line of authority that the Arizona Supreme Court dealt with in *Finck* was based on *Olvera v. Superior Court*, 168 Ariz. 556, 815 P.2d 925 (App.1991). In *Olvera*, we dealt with the question of custody for a twelve-year-old girl whose natural father and stepmother were in the process of a divorce. *Id.* at 557, 815 P.2d

at 926. The trial judge awarded custody to the stepmother, who claimed that she had been the "primary caretaker." *Id.* The husband/father objected on grounds that the trial court had no jurisdiction over the child as she was not a product of the marriage. *Id.*

¶ 94 On review by this court, the *Olvera* court recognized that "[t]he only question presented in *Bryan* was whether the stepfather who stands *in loco parentis* to a stepchild may be granted visitation rights when the marriage of the stepparent and the child's natural parent is dissolved." *Id.* at 558, 815 P.2d at 927. The court's conclusion, however, was just the opposite: "We disagree with *Bryan.*" *Id.* In *Bryan,* the stepparent had expressly taken the place of the natural parent of the same gender. Likewise, though not explicitly stated in *Olvera,* there is no contention in *Olvera* that there was a natural mother who was being deprived of any parental rights or was in any manner involved in the raising of the child to whom the stepmother was granted custody. The stepmother in *Olvera* appears to have taken the place of the mother. Notwithstanding, the *Olvera* court rejected the in loco parentis claim from *Bryan* because, under the statute, the court had no jurisdiction in these circumstances to award custody of a child who was not biologically related to (or adopted by) the parties. The court found this to be so even when the stepparent had taken the natural parent's place. *See Olvera,* 168 Ariz. at 560, 815 P.2d at 929.

¶ 95 When *Olvera* directly rejected *Bryan,* our supreme court was presented in *Finck* with two conflicting cases dealing with the same issue: Was there jurisdiction to allow a stepparent custody or visitation even when the corresponding biological parent was no longer involved with the raising of the child and the stepparent had effectively taken that parent's place? The Arizona Supreme Court in *Finck* answered this question in the negative: Stepparents (or step-grandparents) who had taken the place of parents did not have rights under the statute to seek custody or visitation.

¶ 96 The legislature could certainly have considered the issue from *Finck* to be whether to recognize stepparents (as well as others) who had taken the place of legal parents. The legislative history supports this. This reading is consistent with a view of the statute that "the evil it was designed to address" was when "parents are not parenting" and that it was not intended to change family structure by allowing for additional parents. This reading argues in favor of the limitations in gender and number. Thus, *Finck* can be read both ways. It must be considered in conjunction with the other factors necessary to construe the statute.

## VIII.

### The "Effects and Consequences" of Utilizing the Alternative Definition of Parent

¶ 97 Our supreme court, as mentioned earlier, instructs that "[i]n discerning legislative intent, we look to the ... effects and consequences" of the competing statutory interpretations. *Logan,* 203 Ariz. at 194, ¶ 10, 52 P.3d at 763; *see also Korzep,* 165 Ariz. at 493, 799 P.2d at 834 ("To determine legislative intent, we consider ... the statute's effects and consequences"); *Calvert v. Farmers Ins. Co. of Ariz.,* 144 Ariz. 291, 294, 697 P.2d 684, 687 (1985) ("Additionally, we will look to the ... effects and consequences of the statute."). The potential "effects and consequences" of utilizing the secondary definition of "parent" or construing the statute to allow for additional parents as opposed to those who are taking the place of parents are enormous.

¶ 98 Though there are many effects and consequences, I discuss only four issues or areas impacted: (1) same-sex parenting, (2) polyamory or group relationships, (3) marriage, and (4) the democratic process.

### A. Same–Sex Parenting

¶ 99 This is not a case about same-sex parenting in the sense of sexual orientation, relating to lesbian women or gay men.[16] The

---

16. *See* Nancy D. Polikoff, *This Child Does Have Two Mothers: Redefining Parenthood to Meet the*

*Needs of Children in Lesbian–Mother and Nontraditional Families,* 78 Geo. L.J. 459 (1990) (ar-

stepmother was married to the natural father. At the time of trial, the mother had a male fiancé. Sexual orientation was never an issue, although the facts of record would indicate that both parents are heterosexual. However, the end result of the majority's decision is that there are two persons of the same gender as parents for the same child at the same time. This is the scenario with a same-sex parenting case.

¶ 100 Accepting a definition of "parent" that is not gendered clearly has implications for same-sex parenting in the sense of gay and lesbian partners. One commentator argues that "courts can use the in loco parentis doctrine to accord parental status in lesbian-mother and other non-traditional families." Polikoff, *supra* ¶ 99 note 16, at 508. Other commentators, however, point out that the in loco parentis doctrine has been given a variety of meanings, including that set forth here that the person other than the legal parent must replace a legal parent to have rights. *See, e.g.,* Marcy Goldstein, *The Rights and Obligations of Step–Parents Desiring Visitation with Step–Children: A Proposal for Change,* 12 PROB. L.J., 145, 146–47 (1995) (setting forth the varying applications of in loco parentis doctrine in stepparent cases).

¶ 101 The legislative and judicial history of Arizona's ILP statute, however, does not show any intention to have the statute decide the same-sex parenting issue. Other jurisdictions at the time of (and prior to) this enactment were breaking down the requirement of gender as it relates to a parent. *See, e.g., Matter of Evan,* 153 Misc.2d 844, 583 N.Y.S.2d 997 (Sur.Ct.1992) (allowing for same-sex partner to adopt); *Adoption of Tammy,* 416 Mass. 205, 619 N.E.2d 315 (1993) (same). If the legislature had intended to deconstruct the definition of "parent" as being different from Arizona's longstanding definition of "parent" (with gender restrictions), it could have (and this dissent suggests, would have) made that plain in the language of the statute. *See Taylor,* 198 Ariz. at 317, ¶ 21, 9 P.3d at 1056 (stating that

guing for a new definition of "parent" to include same-sex parents); David L. Chambers & Nancy D. Polikoff, *Family Law and Gay and Lesbian*

the court "must assume ... that the legislature certainly was aware of the case law"). This is not to suggest that same-sex parenting in a lesbian or gay relationship has identical policy considerations as parenting by a mother and stepmother. Thus, adopting a definition without gender limitations in a stepparent case does not necessarily resolve the same-sex parenting issue. However, a consequence of eliminating gender limitations on the term "parent" lays a foundation for a same-sex parenting claim. This does not appear to be a consequence or effect intended by the legislature. This factor weighs in favor of maintaining the definition of parent with limits on gender and precluding a construction that provides for additional parents.

### B. Polyamory or Group Relationships

¶ 102 Another advocated legal movement, this one with parents unconnected to either gender or number, is "polyamory." "Polyamorous relationships involve three or more people in which same-sex and opposite-sex emotional and/or sexual relationships between each person and every other person in the group are equally valued and intended." Maura Strassberg, *The Crime of Polygamy,* 12 TEMP. POL. & CIV. RTS. L.REV. 353, 431, n.23 (2003). "Polyamory," asserted to be legal, is contrasted with the "crime of polygamy." *Id.* Another similar definition used in the legal academic community is as follows:

> By polyamory I mean any affiliation including more than two adults, whether or not sexual. The category includes polygamy, polyandry, group marriage, a lesbian couple with a known sperm donor, and a gay male couple and the biological mother of their child.

Martha M. Ertman, *Changing the Meaning of Motherhood,* 76 CHI.-KENT L.REV. 1733, 1737 n.19 (2001).

¶ 103 While one may consider this to be merely a hypothetical situation in our society not relevant here, the extent of legal literature on the subject, both favorable and unfavorable, demonstrates otherwise. *See* Paula C. Rust, *Monogamy and Polyamory: Rela-*

*Family Issues in the Twentieth Century,* 33 Fam. L.Q. 523 (1999) (giving an overview of same-sex marriage and same-sex parenting recognition).

*tionship Issues for Bisexuals, in* BISEXUALI-
TY: THE PSYCHOLOGY AND POLITICS OF AN
INVISIBLE MINORITY 127, 132 (Beth A. Fire-
stein ed., 1996) (arguing that "some people
are happier and more secure receiving sexu-
al, emotional, and romantic support from a
variety of people instead of only one person,"
and that "[i]f we take off our cultural blind-
ers, we can see that this is, in fact, a very
reasonable approach to needs fulfillment that
provides greater security than monogamy");
David L. Chambers, *Polygamy and Same-
Sex Marriage,* 26 HOFSTRA L.REV. 53, 81–83
(1997) (urging that those who support same
sex marriage consider supporting polygamy);
Martha M. Ertman, *The ALI Principles' Ap-
proach to Domestic Partnership,* 8 DUKE J.
GENDER L. & POL'Y 107, 114–17 (2001) (advo-
cating for the legal recognition of polyamory
and noting one city that has considered ex-
tending domestic partnership provisions to
include polyamorous relationships); Maura I.
Strassberg, *The Challenge of Post–Modern
Polygamy: Considering Polyamory,* 31 CAP.
U.L.REV. 439 (2003) (discussing in detail the
status of polyamory and potential legal rec-
ognition); Stanley Kurtz, *Beyond Gay Mar-
riage: The Road to Polyamory,* THE WEEKLY
STANDARD, August 4, 2003, at 26 (giving a
history, including legal scholarship, relating
to polyamory).

¶ 104 Closely akin to polyamory are do-
mestic relations models based upon the argu-
ment that "the private law of commerce can
be imported to the private law of domestic
relations." Martha M. Ertman, *Contract
Sports,* 48 CLEV. ST. L.REV. 31, 31 (2000).
The argument is that "[e]xisting domestic
relations law posits heterosexual marriage as
naturally superior to other forms of intimate
affiliation, rendering the others (such as co-
habitation, same-sex sexuality, and polyamo-
ry) unnatural and inferior." *Id.* The argu-
ment is expressly based on family structures
with more than two parents: "[a]t least one
municipality has considered extending do-
mestic partnership provisions beyond couples
to include polyamorous affiliations, reasoning
that *intimate partnerships sometimes have
more than two partners just as business
partnerships do.*" Ertman, *The ALI Princi-
ples' Approach, supra* ¶ 103, at 116 (emphasis
added).

¶ 105 Of course, as a matter of logic, once
one breaks down the concept of parents as
one man as a father and one woman as a
mother, polyamorous relationships come into
play. As one scholar notes, "polyamorists
often create families with children." Strass-
berg, *Post–Modern Polygamy, supra* ¶ 103,
at 544. Scholars discuss the "fact that stable
polyfidelitous families do exist." *Id.* at 540.
The "polyfidelitous pledge" is a pledge that
"the individual will not act to enter into
relationships with additional partners without
the consent of the group." *Id.* Thus, those
who are polyamorous, as opposed to monoga-
mous, commit themselves to a group rather
than one person. The group, however, is
unlimited: once the concept of "a single oth-
er individual is abandoned, there is no magic
number of others" upon which the relation-
ship may be based. *Id.* at 541. *See also*
Martha M. Ertman, *Marriage as a Trade:
Bridging the Private/Private Distinction,* 36
HARV. C.R.-C.L. L.REV. 79, 124–25 (2001)
(defining polyamory to include any relation-
ship between more than two persons). In a
very thorough critique of polyamory, one
scholar suggests that rather than attempting
to inculcate "polyamorous" relations in our
society, the focus should shift to groups of
three ("triads," as opposed to couples) or
groups of four ("quads") as an initial step:

> If the polyamorous were to accept limits,
> and focus their experimental energies on
> triads or quads, the reality of these forms
> might prove many of the concerns generat-
> ed by the dynamics of larger groups inap-
> plicable.

Strassberg, *Post–Modern Polygamy, supra*
¶ 103, at 563. Utilizing the adage, "it takes a
village to raise a child," polyamorists claim
they have created their own "village" and
each adult is a "parent." *See id.* at 560 n.
549 ("[A] member of a foursome remarks
that, with four parents, they can provide the
'community'... it takes 'to raise a child.' ").

¶ 106 Allowing more than one person to
take the place of a single parent has the
potential consequence and effect of permit-
ting polyamorous parenting. This, like
same-sex parenting, does not appear to be
intended by the legislature and would raise

issues under Arizona's Constitution.[17] This factor weighs against an interpretation of the statute that utilizes the alternative definition of "parent" or otherwise permits additional parents.

### C. The Impact on Marriage

¶ 107 Arizona has an express legislative policy and statute establishing the importance of marriage between one man and one woman. A.R.S. §§ 25–101(C), –125(A). The policy considerations underlying marriage, and those underlying parenting, are inseparably intertwined. "[M]arriage is about regulating the reproduction of children, families, society." Maggie Gallagher, *What is Marriage For?: The Public Purposes of Marriage Law*, 62 LA. L.REV. 773, 774 (2002). Our own cases clearly recognize this. As quoted in part earlier, "the state is also vitally concerned with the establishment of marriages because marriage is a relationship in which 'the public is deeply interested, for it is the *foundation of the family* and of society, without which there would be neither civilization nor progress.' " *Moran*, 188 Ariz. at 144, 933 P.2d at 1212 (quoting *Maynard*, 125 U.S. at 211, 8 S.Ct. 723) (emphasis added); *see also Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) ("Marriage . . . is an association that promotes a way of life."); *Murphy v. Ramsey*, 114 U.S. 15, 45, 5 S.Ct. 747, 29 L.Ed. 47 (1885) (recognizing "the idea of the family, as consisting in and springing from a union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization").

¶ 108 An interpretation of the statute that allows for family structures based on relationships that are not sanctioned for marriage, has an effect on one of the key purposes of marriage: parenting. The interconnection of marriage and parenting is evident in the same-sex marriage movement and same-sex parenting. *See, e.g.*, Ruthann Robson, *Assimilation, Marriage, and Lesbian Liberation*, 75 TEMP. L.REV. 709, 803 ("[T]he struggle for same-sex marriage and lesbian/gay parenting rights have become intertwined."). The cases make this evident as well. For example, in *In re B.L.V.B.*, 160 Vt. 368, 628 A.2d 1271 (1993) the lesbian partner of a birth mother was allowed to adopt the mother's biological child. 628 A.2d at 1273–76. The rationale was to create a parent-child relationship in the best interests of the child. *Id.* at 1276. The purpose was to create a family structure based on two partners of the same sex and a child.

¶ 109 In Arizona, the state endorses and permits, through providing for marriage, divorce, adoption, and paternity, family structures founded on one man *and* one woman or one man *or* one woman. To allow for other family structures not based on marriage, and not otherwise authorized by statute, creates the availability of other family structures that directly compete with marriage.

¶ 110 There are voices that promote marriage between one man and one woman [18] and there are voices that do not, or consider

---

17. Arizona's Constitution expressly prohibits "polygamous cohabitation" in addition to polygamous marriage. Ariz. Const. art. 20, par. 2 ("Polygamous or plural marriages, or polygamous cohabitation, are forever prohibited within this State.").

18. *See, e.g.*, Linda J. Waite & Maggie Gallagher, THE CASE FOR MARRIAGE: WHY MARRIED PEOPLE ARE HAPPIER, HEALTHIER, AND BETTER OFF FINANCIALLY 11 (2000) ("[M]arriage can work its miracles only if it is supported by the whole society. Marriage cannot thrive, and may not even survive, in a culture that views it as just another lifestyle option."); David Orgon Coolidge & William C. Duncan, *Reaffirming Marriage: A Presidential Priority*, 24 HARV. J.L. & PUB. POL'Y 623, 638 (2001) ("If Americans believe that children thrive best with both a mother and father, and that marriage is the central social institution that brings men, women and children together, they should have the right to recognize it as an institution in law and support it in public policy."); Lynn D. Wardle, *The Potential Impact of Homosexual Parenting on Children*, 1997 U. Ill. L.Rev. 833, 911 (arguing that the legal and academic communities have supported same-sex marriage and parenting too hastily and providing an appendix of social scientific studies on same-sex parenting); Stanley Kurtz, *The End of Marriage in Scandinavia: The "Conservative Case" for Same–Sex Marriage Collapses*, THE WEEKLY STANDARD, February 2, 2004, at 26, 33 (arguing in favor of strengthened "links between American marriage and parenthood").

it as just one of many acceptable family structures.[19] For instance, one scholar contends that "marriage-based families are not perfect, fail-proof institutions ... [but] they are incomparably superior to any other model of a companionate or nurturing relationship ... [and] there is no rational basis for believing that any other intimate or nurturing human relationship can do as well." Lynn D. Wardle, *Is Marriage Obsolete?*, 10 MICH. J. GENDER & L. 189, 214 (2003). Others counter with the exact opposite view: "I suggest we destroy the marital model altogether and collapse all sexual relationships into the same category—private—not sanctioned, privileged, or preferred by law." Martha Albertson Fineman, THE NEUTERED MOTHER, THE SEXUAL FAMILY AND OTHER TWENTIETH CENTURY TRAGEDIES 5 (1995).

¶ 111 The consequence and effect of adopting the alternative definition of "parent," or sanctioning additional parents, is to take a position on and act contrary to Arizona's express statutory policy of family structure based on (1) a marriage consisting of one man and one woman, (2) one man and one woman who are not married, or (3) one unmarried person, either a man or a woman.[20] As described more fully in the next portion of this dissent, the competing views on this subject, and its effect on family structure, should be addressed through the democratic process, not as part of a judicial interpretation adopting an alternative definition of the term "parent."

### D. Representative Democracy

¶ 112 The Arizona Constitution provides that "[a]ll political power is inherent in the people." Ariz. Const. art. 2, § 2. The "legislative authority of the State" is vested in the Senate and the House of Representatives, not the judicial branch. Ariz. Const. art. 4, pt. 1, § 1. "[T]he people" also expressly "reserve[d] the power to propose laws and amendments to the Constitution and to enact or reject such laws and amendments at the polls, independently of the Legislature." *Id.*

¶ 113 The relationship between parents and children—the family structure—goes to the core of our society. *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Woodworth*, 202 Ariz. at 183, ¶ 22, 42 P.3d at 614 ("The health of the family is critical to the health and vibrancy of our communities and our state."). If there is an accepted definition of "parent" that applies to the ILP statute, the decision to change it should be made by the people, either directly or through the legislature in a representative capacity, not by the court. *See Ogden v. Blackledge*, 6 U.S. (2 Cranch) 272, 277, 2 L.Ed. 276 (1804) ("To declare what the law is, or has been, is a judicial

---

19. *See, e.g.*, ALI–PRINCIPLES §§ 6.01–06 (setting forth principles for recognition of "domestic partners"); *id.* at § 6.02, cmt. a (noting that "although society's interest in the orderly administration of justice and the stability of families are best served when the formalities of marriage are observed, a rapidly increasing percentage of Americans form domestic relationships without such formalities"); Stephanie Coontz, THE WAY WE REALLY ARE 172 (1997) (urging that we "stop arguing about the relative merits of ideal family types"); David L. Chambers, *For the Best of Friends and for Lovers of All Sorts, A Status Other Than Marriage*, 76 NOTRE DAME L.REV. 1347, 1348 (2001) (proposing a "designated friend" legal status to give state sanction to mutual responsibilities of any two people); William N. Eskridge, Jr., *Comparative Law and the Same–Sex Marriage Debate: A Step by Step Approach toward State Recognition*, 31 McGEORGE L.REV. 641, 661 (2000) (arguing in favor of same-sex marriage and commenting on the "hysteria and irresponsibility in opponents' predictions" that it will undermine

the institution of marriage); Paula L. Ettelbrick, *Domestic Partnership, Civil Unions, or Marriage: One Size Does Not Fit All*, 64 ALB. L.REV. 905, 914 (2001) (arguing that the law should reflect numerous and different forms of family relationships that exist in our society).

20. For a discussion of the problem of multiple parents as a result of multiple monogamous relationships, see *Sharon S. v. Superior Court*, 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554, 586–87 (2003) (Brown, J., dissenting) (referring to a "the-more-parents-the-merrier" view of parenthood and noting that "[t]he law permits single individuals to adopt a child on their own because one parent is better than none. It does not follow, however, that two unrelated parents are better than one.... [I]f the birth parent has a relationship with a second parent, and then a third, and then a fourth, the child may be worse off than if the birth parent had simply raised the child alone").

power; to declare what the law shall be, is legislative."); *see also Chevron Chem. Co. v. Superior Court*, 131 Ariz. 431, 440, 641 P.2d 1275, 1284 (1982) (same); *Winsor v. Glasswerks Phx, L.L.C.*, 204 Ariz. 303, 310, ¶ 24, 63 P.3d 1040, 1047 (App.2003) ("This is the type of policy issue 'best handled by legislatures with their comprehensive machinery for public input and debate.' ") (quoting *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 441 (7th Cir. 1977)). The people, not judges, should decide.

¶ 114 In cautioning against the temptation to take issues from the people that should be decided by them, one of the judiciary's own famously said:

For myself it would be most irksome to be ruled by a bevy of Platonic Guardians, even if I knew how to choose them, which I assuredly do not. If they were in charge, I should miss the stimulus of living in a society where I have, at least theoretically, some part in the direction of public affairs.

Learned Hand, THE BILL OF RIGHTS 73 (1958). With all due respect to Judge Hand, the "direction of public affairs" *by the people* should be more than theoretical. As Jefferson put it, "I know of no safe depository of the ultimate powers of the society but the people themselves." [21] Lincoln agreed: "the candid citizen must confess that if the policy of the government upon vital questions, affecting the whole people, is to be irrevocably fixed by decisions ... in ordinary litigation between parties, in personal actions, the people will have ceased to be their own rulers[.]" [22]

¶ 115 In an area as critical as defining the structure of families, the court should clearly err on the side of allowing the people to decide whether and how to draw the lines rather than making it a judicial function. The sharply contrasting views on issues that this case directly implicates (same-sex parenting, polyamorous relations, marriage and family structure) should be resolved by principles of representative democracy, not judicial interpretation. The negative effect on the principles of representative democracy, which results from having the judiciary make broad social policy decisions, is a factor that weighs against stepmother's position.

## IX.

### *"Serious Constitutional Problems"*

¶ 116 We have a duty to construe a statute in a constitutional fashion. *Hayes*, 178 Ariz. at 272, 872 P.2d at 676. This is particularly so when we are confronted with one interpretation that may be constitutional and one that may not:

[W]here an otherwise acceptable construction of a statute would *raise serious constitutional problems, the Court will construe the statute to avoid such problems* unless such construction is plainly contrary to the intent of Congress.

*Edward J. DeBartolo Corp.*, 485 U.S. at 575, 108 S.Ct. 1392 (emphasis added).

¶ 117 In *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the Court set forth:

The interest of parents in the care, custody, and control of their children [ ] is perhaps the oldest of the fundamental liberty interests recognized.

As the Court has indicated, parents and guardians have the liberty "*to direct the upbringing* and education of children under their control." *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (emphasis added); *see also, e.g., Troxel*, 530 U.S. at 65, 120 S.Ct. 2054; *Yoder*, 406 U.S. at 232, 92 S.Ct. 1526; John Dewitt Gregory, *Whose Child Is It, Anyway: The Demise of Family Autonomy and Parental Authority*, 33 FAM. L.Q. 833 (1999) (arguing for increased protection of parental rights).

¶ 118 In *Graville v. Dodge*, we held A.R.S. § 25–409 to be constitutional as tested against the express provision allowing for *grandparents* to have court-enforced visitation over a legal parent's objections. 195

---

21. Letter from Thomas Jefferson to William Charles Jarvis on September 28, 1820, WRITINGS OF THOMAS JEFFERSON, Albert Ellory Bergh, ed., XV, 278 (1904).

22. Abraham Lincoln, First Inaugural Address, March 4, 1861, ABRAHAM LINCOLN: HIS SPEECHES AND WRITINGS, Roy P. Basler, ed., 585–86 (Second Edition 2001).

Ariz. at 125–26, ¶¶ 24, 27, 985 P.2d at 610–11. In *Jackson v. Tangreen,* 199 Ariz. 306, 309–10, ¶¶ 6–15, 18 P.3d 100, 103–04 (App.2000), we upheld the same provision for grandparent visitation after considering the standards that could be gleaned from the plurality decision in *Troxel.* Employing the alternative definition of "parent" as though it were part of the ILP statute raises substantially more difficult and broader constitutional concerns than those presented in *Graville* and *Jackson.* In dealing solely with grandparents, *Graville* and *Jackson* addressed a statute with (1) a limited number of people (grandparents) who were (2) biologically related and (3) in a category expressly called out by the legislature. On the other hand, if the alternative definition for "parent" ("a person who brings up and cares for another") is employed when construing the ILP statute, we deal with (1) an *unlimited* number of persons who are (2) *not* biologically related and (3) *not* expressly sanctioned by the legislature. *Graville* and *Jackson* clearly presented a different issue than the issue presented here.

¶ 119 There is no need to formally determine whether the ILP statute, as construed by stepmother, is unconstitutional as the issue was not directly raised. However, for purposes of *statutory construction* we must still consider whether the construction proposed by stepmother "raise[s] serious constitutional problems." *Edward J. DeBartolo Corp.,* 485 U.S. at 575, 108 S.Ct. 1392. A construction of the statute that utilizes the alternative definition of "parent," or permits additional, unspecified parents, does just that. This is another consideration that strongly weighs in favor of utilizing the definition of "parent" with gender and number limitations and construing the statute to provide for those who take the place of parents rather than those who act in addition to or in support of parents.

### X.

### *Summary of Statutory Analysis and Application to the Facts*

¶ 120 The purpose of this dissent has been to set forth comprehensively the factors that must be considered under our case law to construe the portions of the ILP statute at issue here. As noted at the outset, we first look to the plain language of the statute. *Scottsdale Healthcare,* 206 Ariz. at 5, ¶ 10, 75 P.3d at 95. If appropriate, and then in conjunction with the plain language analysis, we "look to the statute's policy, the evil it was designed to address, its words, context, subject matter, and effects and consequences." *Logan,* 203 Ariz. at 194, ¶ 10, 52 P.3d at 763.

¶ 121 As a result of the statutory phrase, "treated as a parent by the child," A.R.S. § 25–415(G)(1), the first fundamental issue is what the term "parent" means as included within that phrase. Paraphrasing, and restating, the two options are as follows:

> "In loco parentis" means a person who has been treated by the child [*as the child's mother* or *the child's father* ] and who has formed a meaningful parental relationship with the child for a substantial period of time;

or

> "In loco parentis" means a person who has been treated by the child [*as one who brings up and cares for the child* ] and who has formed a meaningful parental relationship with the child for a substantial period of time.

Gender and number limitations on the term "parent" adhere in the first option; they do not adhere in the second.

¶ 122 As to a plain language analysis, "[w]e give words their usual and commonly understood meaning *unless the legislature clearly intended a different meaning.*" *Korzep,* 165 Ariz. at 493, 799 P.2d at 834 (citation omitted) (emphasis added). As the section on plain language discusses, *supra* ¶¶ 41–61, the "ordinary and usual" meaning of the term "parent" in Arizona has been "one who begets or brings forth an offspring ... the natural father and mother." *Sailes,* 17 Ariz. App. at 596, 499 P.2d at 724 (quotations omitted). Thus, a plain language analysis of the statute leads to a conclusion that the legislature intended to use this definition. On this analysis, the term "parent" has number and gender limitations: one man as a father and one woman as a mother.

¶ 123 Considering the broad range of factors beyond plain language, which constitutes the bulk of this dissent, leads to the same conclusion. The legislature did not choose to recognize for special treatment the relationship of stepparents as it did for grandparents and great-grandparents. It chose to adopt a mandated definition of in loco parentis that is expressly required for both custody and visitation. Returning to the requirements for statutory construction from *Logan* which this dissent has applied, all of them, with one potential exception, point to the legislature intending the word "parent" to mean what it had always meant. The one potential exception is that aspect of the legislative history based on *Finck v. O'Toole.* The facts in *Finck* can be read to support the definition of "parent" without number and gender limitations. They can also be read to support a definition that contains those limits.

¶ 124 However, even if one takes the view that *Finck* cannot be reconciled with the definition of "parent" containing gender and number limitations, one is left with this sobering thought: *Finck* is not the statute. What the legislature enacted is the statute. One must take the language of the statute, not *Finck,* and apply and construe what the legislature passed as law.

¶ 125 Examining the statute the legislature passed, "the statute's policy," *supra* ¶¶ 67–76, "the evil it was designed to address," *supra* ¶¶ 77–96, "its words," *supra* ¶¶ 41–61, "context," *supra* ¶¶ 67–76, "subject matter," *supra* ¶¶ 62–66, and "effects and consequences," *supra* ¶¶ 97–115, all lead to a conclusion that the legislature did not intend to utilize the alternative definition of the term "parent" that eliminated gender and number limitations. *See Logan,* 203 Ariz. at 194, ¶ 10, 52 P.3d at 763. This conclusion is strengthened by the presence of very "serious constitutional problems," *see supra* ¶¶ 116–119, if one is to construe the ILP statute with the alternative definition of "parent." If a construction of the term "parent" which is contrary to our existing law is to be given, it should be stated directly by the legislature, not announced by the court.

¶ 126 If one determines, contrary to this analysis, that the alternative definition of

"parent" was nonetheless intended, then it is still necessary to determine whether the person seeking ILP status must take the place of a parent or may qualify if acting in addition to functioning parents. For the reasons discussed under each aspect of the statutory analysis, I conclude that the legislature did not intend to provide for those who had only acted in support of, or in addition to, the child's parents. Even *Finck v. O'Toole,* the strongest aspect of stepmother's argument, cuts against her. The step-grandparents in *Finck* appear to have replaced both parents for a period of time. Those are not the facts here, and more importantly, given the pertinent factors we are required to consider, not the language or intent of the statute.

¶ 127 I conclude that under both the plain language of the statute and the broader analysis, we are not permitted to effectively modify the statutory language "treated as a *parent* by the child." Stepparent relationships are clearly important in our community. But we are not at liberty to modify the language of the statute to accommodate the request of a stepparent. This is particularly so when the consequence of making the modification for a stepparent would be to judicially unhinge the ties of gender and number contained within Arizona's definition of the term "parent." If such unhinging is a task to be done, it is for the legislature or the people directly, not the court.

¶ 128 As the trial judge found after hearing all the evidence, the child's "natural mother and father fulfilled the rights and responsibilities of parents." Stepmother "played a supportive role to her husbands [sic] role of father." There is no challenge that these findings constitute an abuse of discretion. As the trial court determined, stepmother "has shown that she was a caring and supportive *step-parent.*" But the trial court also found that she "had *not* carried her burden to prove that [the child] has treated her as a *parent* and that she has formed a meaningful *parental* relationship with [the child]." (Emphasis added). The trial judge was correct in denying relief on the facts of this case.

## XI.

### The Majority's Response

¶ 129 The majority finds fault in this dissent on a number of grounds, which are addressed below.

### A. Additional Parents

¶ 130 The majority rejects a definition of "parent" that places a limit on both gender and number. The majority nonetheless asserts that "[t]he Dissent's arguments are based on the erroneous notion that our interpretation of A.R.S. § 25–415 creates additional parents for a child, which are unlimited in number and gender combinations." *Supra* ¶ 15. With all due respect, the majority cannot both have its cake (rejecting limits on the term "parent") and eat it, too (saying its holding does not permit additional parents). The majority seeks to justify its conclusion—that it is not allowing for additional parents—in several ways.

¶ 131 First, the majority phrases the query in terms of "in loco parentis *visitation,*" *supra* ¶¶ 10, 15, 17, 18, 20, 22, as opposed to determining whether one has met the in loco parentis *requirement,* as if to suggest that there is some sort of reduced definition of "in loco parentis" when a person is seeking visitation as opposed to custody. This is not the case. The same definition of in loco parentis applies to both. A.R.S. § 25–415(A)(1) (for a "*child custody* proceeding ... [t]he court shall summarily deny a petition unless it finds that ... [t]he person filing the petition stands *in loco parentis* to the child") (emphasis added); A.R.S. § 25–415(D) ("A grandparent, a great-grandparent or a person who stands *in loco parentis* to a child may bring a proceeding for *visitation* rights") (emphasis added); A.R.S. § 25–415(G)(1) (" 'In loco parentis' means a person who has been treated as a parent by the child....."). That there are further requirements for custody, A.R.S. § 25–415(A)(2)(4), different from those for visitation, A.R.S. § 25–415(C), neither removes *nor reduces* the express statutory requirement for in loco parentis that pertains to each. *Id.* As part of the in loco parentis requirement, whether for visitation or custody, the person seeking either custody or visitation must be "treated as a *parent* by the child." A.R.S. § 25–415(A)(1) & (C).

¶ 132 Second, the majority makes the pronouncement that "[a] person standing in loco parentis to a child is not a 'parent' [and] does not enjoy parental rights." *Supra* ¶ 18. In that event, the argument goes, there are no additional parents. *Id.* I believe it would come as a surprise to the legal parent, who had opposed and lost a custody or visitation contest to a person claiming to be in loco parentis, to be informed that the person who so obtained custody or visitation of the legal parent's child was not exercising "parental rights." If the legal parent wishes to refuse the custody or visitation so ordered he or she would be subject to a contempt citation and jail for refusing to relinquish the child. A.R.S. § 25–414(A)(1) (Supp.2003) (The court can "[f]ind the violating parent in contempt of court" if the court "finds that a parent has refused without good cause to comply with the visitation or parenting time order"); A.R.S. § 25–408(D) (Supp.2003) ("A parent who does not comply with the notification requirements of this subsection is subject to court sanction."). No *legal* parent can fully exercise "parental rights" to the child when an ILP parent, for lack of a better term, has physical control of the child through state-compelled custody or visitation granted pursuant to A.R.S. § 25–415(A) or (C). If the ILP parent does not have "parental rights," as the majority holds, that would mean that an ILP parent who is exercising custody or visitation has no duty to provide for, supervise, and care for the child in his or her charge. Surely, in a statute that applies to children aged seventeen months as well as those aged seventeen years, this cannot be the law.

¶ 133 The majority's denial that its interpretation fundamentally changes family structure by allowing for additional parents does not bear scrutiny. The majority's interpretation expressly allows for additional parents. These are the reasons:

¶ 134 First, the majority accepts the appellant's definition of parent which is "a person who brings up and cares for another." This express definition is neither limited in number or by gender.

¶ 135 Second, the majority expressly rejects the proposition that "a child can only have one mother and one father ... unless that person serves as a same-gender substitute for one of the child's parents." *Supra* ¶ 15. This is a direct statement endorsing the view that the ILP statute allows for *additional* parents and rejecting the view that the ILP statute provides for persons *taking the place of* parents.

¶ 136 Third, the majority holds that whether a person is treated as a parent, and thus entitled to visitation under the ILP statute, "is not dependent on a finding that the child does not or did not enjoy a meaningful and healthy relationship with one or both legal parents." *Supra* ¶ 17. The incontrovertible result of such a holding is that if a child already has a good relationship with both parents, yet someone else can also be "treated as a parent by the child," A.R.S. § 25–415(G)(1), then there will be at least three individuals who are parents. Thus, the express principle applied by the majority is based on allowing additional parents. This express principle provides no limitation on the number of parents based on either gender or number.

¶ 137 Fourth, on the facts of this case the majority allows for additional parents as opposed to persons who take the place of parents. It is undisputed that the only time stepmother could have been "treated as a parent by the child" was when Cody had a fully functioning father and mother. Factually, the majority allows for three parents: father, mother, and stepmother.

¶ 138 For the above reasons, the majority's assertion that it does not allow for additional parents is not correct.

### B. Equating "Parent" with In Loco Parentis

¶ 139 The majority asserts that this dissent "blurs the concepts of 'parent' and 'in loco parentis.'" *Supra* ¶ 15. It further contends that the dissent "errs by ... equating parents with persons who stand in loco parentis to a child." *Supra* ¶ 23. That the majority is not correct is apparent by one of this dissent's key points: the definition of "parent" that one utilizes in construing the ILP statute makes all the difference in determining what it means. As set forth at the outset, *supra* ¶ 27, depending upon which of the two differing definitions of "parent" is inserted into the ILP statute, two very different readings result. This dissent demonstrates that, far from "equating" parents with those who stand in loco parentis, the meaning of the word "parent" that one utilizes brings about a dramatic change in the meaning of the ILP statute. It is for this reason that the definition is the fundamental issue of this case.

¶ 140 With all due respect, it is the majority's decision not to acknowledge or address the competing definitions of "parent"—and Arizona's long history of utilizing one of them—that leads to its claim that the dissent "equates" in loco parentis with one of the two competing definitions of the term.

### C. Additional Requirements to the Plain Language

¶ 141 The majority contends that in defining in loco parentis "the legislature did not require a showing that the child substituted the petitioning party for a legal parent." *Supra* ¶ 18. The majority also argues that the "view that a petitioning party cannot be in loco parentis if the child has a parent of the same gender as the petitioning party is unsupported by the plain language of § 25–415." *Supra* ¶ 19. It claims that "[n]either the definition of 'in loco parentis' nor the criteria for obtaining visitation rights requires that the petitioning party be of a different gender than a legal parent." *Id.*

¶ 142 With respect, these statements show the majority's most critical flaw: its decision not to recognize or address the presence of the term "parent" in the ILP statute and Arizona's longstanding definition of that term. One definition or another of the term "parent" must be utilized. The terms "parent" and "parental relationship" are terms contained in the ILP statute. When construing a statute we are required to construe it, if possible, so that "no clause, sentence or word is rendered superfluous, void, contradictory or insignificant." *State v. Deddens*, 112 Ariz. 425, 429, 542 P.2d 1124, 1128 (1975)

(citations omitted). Unless one gives an alternative definition to the term "parent," the ILP statute requires limitations in number and gender that are inherent in "one who begets or brings forth offspring." *Sailes*, 17 Ariz.App. at 596, 499 P.2d at 724. The limitation in those who "beget or bring forth offspring," unless we construe the term to mean use of artificial or reproductive technologies, means one person of each gender. We are not free to "change the meaning of simple English words so that the resulting interpretation conforms the statute to the sociological and economic views of judges or lawyers." *Kilpatrick v. Superior Court ex rel County of Maricopa,* 105 Ariz. 413, 421, 466 P.2d 18, 26 (1970).

¶ 143 The majority claims that this dissent *adds* requirements to the plain language when the dissent utilizes the definition of "parent" that had been employed in Arizona for decades. This dissent has not ignored the plain language nor given requirements in addition to that language; it has given effect to that language.

### D. The "Treated As" Language

¶ 144 The majority asserts that the language "treated as," in the phrase "treated as a parent" has been rendered "entirely superfluous" by the dissent. *Supra* ¶ 16. The majority claims that "[t]he Dissent mistakenly assumes that 'treated as a parent' and 'parental relationship' are synonymous with 'parent.'" *Id.* This criticism shows a misunderstanding of the dissent and the statute.

¶ 145 As noted at the outset of the dissent, *supra* ¶ 27 and throughout, e.g., *supra* ¶¶ 68–76, the entire purpose of the ILP statute was to provide for custody and visitation for those "other than a legal parent." A.R.S. § 25–415(A); *see also* A.R.S. § 25–415(C), (D) & (G). There is no need to create a statute for legal parents to have custody and visitation rights with their own children. They already possess those rights. The dissent gives full effect to the phrase "treated as" by providing for those that are not "legal parents" who have been "treated as a parent by the child and who ha[ve] formed a meaningful parental relationship with the child." A.R.S. § 25–415(G). The question is whether those persons must be "treated as" (but not *be* ) the child's mother or the child's father or whether they may simply act in support of or in addition to a child's fully functioning mother or father. The majority's criticism on grounds of the "treated as" language is not well-founded.

### E. Other Claims

¶ 146 The majority makes a number of other assertions as to how this dissent is in error. They are addressed here.

¶ 147 The majority argues that the legislature could not have intended that the statute refers to those taking the place of a parent because "if we adopted the Dissent's position, a party could never obtain in loco parentis visitation when both legal parents are living." *Supra* ¶ 19. This is incorrect. Both legal parents may be living and another person may be in loco parentis. This would be the case when a legal parent is not functioning in that role, but is still alive. The question is not whether the parents are living. It is whether the person seeking ILP status is "treated as a parent by the child" and "formed a meaningful parental relationship with the child." A.R.S. § 25–415(G)(1).

¶ 148 The majority contends the dissent is wrong because "if Cody's father had established a relationship with a same-sex partner rather than marrying Stepmother, that partner, but not Stepmother, could be qualifying for in loco parentis status under the Dissent's view." *Supra* ¶ 22. This is also incorrect. The majority's hypothetical is that if the deceased father had a same-sex partner (instead of stepmother) then the same-sex partner could qualify as he would be a *man* who is replacing the father as opposed to a *woman.* Thus, the argument goes, there is still only one man as a father (the same-sex partner) and one woman as a mother (the mother).

¶ 149 The majority misunderstands how the ILP statute applies. To qualify for in loco parentis status the person must be "treated as a parent by the child." Like an opposite-sex partner, a same-sex partner could not qualify if, as in the hypothetical posed by the majority and as is present here,

the child *already had* a functioning father and mother. Either an opposite-sex partner or a same-sex partner could not qualify as that would bring the number of parents at the same time to three. The statute requires that the court look to the conduct *prior* to the initiation of the ILP petition to determine whether the person is in loco parentis: "*treated* [past tense] as a parent by the child and who has *formed* [past tense] a meaningful parental relationship with the child *for a substantial period of time* [conduct in the past]." A.R.S. § 25–415(G)(1). Additionally, A.R.S. § 25–415(D) requires a person, other than a grandparent or great-grandparent, to be in loco parentis in order to "*bring a proceeding* for visitation rights." The statutory references are all for conduct *prior to* the petition. Stepmother's claim is proper in this regard; it is based on a pre-petition relationship. However, no third person (whether same-sex partner or opposite-sex partner) can qualify to be in loco parentis if the time period for which the person claims to be in loco parentis is a time period in which the child already had a functioning father and a functioning mother. The majority's hypothetical is wrong and based on a misunderstanding of how the statute applies.

¶ 150 The majority also claims that the dissent is in error based on *Finck v. O'Toole,* 179 Ariz. 404, 880 P.2d 624. The majority claims that if *Finck* was viewed according to this dissent's reasoning, "the court could not have awarded in loco parentis visitation to the step-grandmother ... because the child's mother had custody of him and parented him. Conversely, the step-grandfather could have obtained in loco parentis visitation because the child did not know his biological father." *Supra* ¶ 22. The majority claims this is an absurd result that shows the legislature could not have intended that the term "parent" in the ILP statute be tied to gender and number.

¶ 151 *Finck* is discussed at length herein. *Supra* ¶¶ 81–96. *Finck* can be read in a number of ways to support or cut against both the majority and the dissent. The majority's hypothetical (that both step-grandparents could not be considered parents if the mother was actively parenting) is correct;

the conclusion as to its impact is not. The hypothetical only leads to an absurd result if one believes that it is "absurd" not to recognize the family status of step-grandparents. The legislature did not recognize this family relationship as an exception to the in loco parentis requirement. They could have, but they did not.

¶ 152 While the majority contends that it is absurd to not recognize the relationship of step-grandparents, others contend that it is absurd not to recognize the rights to same-sex and polyamorous parenting. *Supra* ¶¶ 99–101, 103–05. The key, however, is what the legislature intended as discerned by applying the rules for statutory interpretation as set forth herein. That analysis, as set forth at length above, is that the legislature intended to preserve family structure but allow for persons "other than a legal parent," A.R.S. § 25–415(A), to take the place of others within that structure. If there is to be an exception carved out for step-grandparents (or stepparents), then that needs to be *legislatively* provided, not *judicially* accommodated as the majority would do here.

## *XII.*

### *Conclusion*

¶ 153 For the reasons set forth above, I would affirm the decision of the trial court. Accordingly, I respectfully dissent.

### Appendix

§ 25–415. Custody by nonparent; presumption; grounds; definitions

A. A child custody proceeding may also be commenced in the superior court by a person other than a legal parent by filing a verified petition, or by a petition supported by an affidavit, in the county in which the child is permanently resident or is found. The petition shall include detailed facts supporting the petitioner's right to file the petition. The petitioner shall provide notice as required by subsection e. Notice shall include a copy of the petition and any affidavits. The court shall summarily deny a petition unless it finds that the petitioner by the pleadings established that all of the following are true:

1. The person filing the petition stands in loco parentis to the child.

2. It would be significantly detrimental to the child to remain or be placed in the custody of either of the child's living legal parents who wish to retain or obtain custody.

3. A court of competent jurisdiction has not entered or approved an order concerning the child's custody within one year before the person filed a petition pursuant to this section, unless there is reason to believe the child's present environment may seriously endanger the child's physical, mental, moral or emotional health.

4. One of the following applies:

(a) One of the legal parents is deceased.

(b) The child's legal parents are not married to each other at the time the petition is filed.

(c) There is a pending proceeding for dissolution of marriage or for legal separation of the legal parents at the time the petition is filed.

B. If a person other than a child's legal parent is seeking custody there is a rebuttable presumption that it is in the child's best interest to award custody to a legal parent because of the physical, psychological and emotional needs of the child to be reared by the child's legal parent. To rebut this presumption that person must show by clear and convincing evidence that awarding custody to a legal parent is not in the child's best interests.

C. The superior court may grant a person who stands in loco parentis to a child, including grandparents and great-grandparents, who meet the requirements of § 25–409 reasonable visitation rights to the child on a finding that the visitation is in the child's best interests and that any of the following is true:

1. One of the legal parents is deceased or has been missing at least three months.

2. The child's legal parents are not married to each other at the time the petition is filed.

3. There is a pending proceeding for dissolution of marriage or for legal separation of the legal parents at the time the petition is filed.

D. A grandparent, a great-grandparent or a person who stands in loco parentis to a child may bring a proceeding for visitation rights with a child by filing a verified petition in the county in which the child is permanently resident or is found.

E. Notice of a custody or visitation proceeding filed pursuant to this section shall be served pursuant to the rules of civil procedure to all of the following:

1. The child's parents.

2. A person who has court ordered custody or visitation rights.

3. The child's guardian or guardian ad litem.

4. A person or agency that has physical custody of the child or that claims to have custody or visitation rights.

5. Any other person or agency that has previously appeared in the action.

F. A person shall file proceedings for custody or visitation under this chapter in the same action in which the legal parents had their marriage dissolved or any other proceeding in which a previous custody order has been entered regarding the child.

G. For the purposes of this chapter:

1. "In loco parentis" means a person who has been treated as a parent by the child and who has formed a meaningful parental relationship with the child for a substantial period of time.

2. "Legal parent" means a biological or adoptive parent whose parental rights have not been terminated.